### GAVEY PROPERTIES/762,
#### Plaintiff–Appellant,

#### v.

### FIRST FINANCIAL SAVINGS & LOAN ASSOCIATION, et al.,
#### Defendants–Appellees.

#### No. 87–1111.

United States Court of Appeals,
Fifth Circuit.

May 10, 1988.

C. Henry Kollenberg, Schlanger, Cook, Cohn, Mills & Grossberg, Houston, Tex., for plaintiff-appellant.

Jerry P. Jones, Thompson & Knight, Dallas, Tex., for defendants-appellees.

Dorothy L. Nichols, Sr. Associate General Counsel, Washington, D.C., amicus curiae, Federal Home Loan Bank Bd.

---

1. 828 F.2d 257, reh'g en banc granted, 828 F.2d 269 (5th Cir.1987).

Before GARWOOD and JONES, Circuit Judges, and BLACK *, District Judge.

EDITH H. JONES, Circuit Judge:

Appellant, Gavey Properties/762 ("Gavey"), seeks reversal of the summary judgment denying relief on its claim of usury against Appellee, First Financial Savings & Loan Association ("First Financial").[1] The district court, interpreting 12 U.S.C. § 1730g(a), held that the loan was governed by Illinois law, which does not impose a commercial loan usury limit. We affirm the district court's construction of the "most-favored lender" provision of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA).

## BACKGROUND

Gavey, located in Texas, negotiated a loan from First Financial, located in Illinois, to finance the renovation of a Dallas-area apartment project it owned. The loan commitment, executed in January 1982, required Gavey to submit an opinion of counsel attesting "that the interest rates charged on the loan did not exceed the maximum applicable rate allowed by the law of the jurisdiction where the property is located."

The loan was closed the following month. The note executed by Gavey states that the parties intended for the laws of the state of Texas and the United States to control the usury limits of the transaction.[2] The note also states that it is secured by a wraparound deed of trust and that the conditions of the deed of trust are incorporated into the note. The deed of trust provides that it is governed by Texas law.[3] Finally, Gavey executed a letter to First Financial to affirm, somewhat contradictorily, that the loan it was undertaking was intended to be a business loan as outlined in "Chapter 74, section 4, paragraph C", Illinois usury law. Ill.Rev.Stat.1980 Supp., Chap. 74, ¶ 4(c).

At the pertinent times, the usury limit in Texas was no higher than 28%. Although the loan may have been intended to fall within this limit if it had been paid according to schedule, the effective interest rate significantly exceeded 28% because Gavey paid off the loan early as a result of a refinancing transaction.

## DISCUSSION

■ The interest rates of First Financial were governed by 12 U.S.C. § 1730g(a).[4] We interpret section 1730g(a) to allow a federally insured savings and loan association to charge the highest of three possible interest rates: the rate it would be permitted to charge in the absence of the provision; a rate of not more than one percent in excess of the discount rate on 90–day commercial paper in effect at the Federal Reserve Bank in the federal reserve district where such institution is located; or the rate allowed by the laws of the state,

---

* District Judge of the Southern District of Texas, sitting by designation.

1. First Financial was succeeded by First Federal Savings and Loan Association of Chicago which assumed First Financial's assets and liabilities. Citicorp Savings of Illinois subsequently succeeded First Federal, assuming its assets and liabilities.

2. "It is the intention of the parties hereto to conform *strictly to the applicable laws of the* state of Texas and the United States of America and judicial and/or administrative interpretations or determinations thereof ("law"), regarding the contracting for, charging and receiving of interest for the use of and detention of money."

3. Paragraph 23: "It is intended that this deed of trust is made with reference to and shall be construed as a Texas contract governed by the laws thereof."

4. Section 1730g(a) states: *"If the applicable rate prescribed in this section exceeds the rate an insured institution would be permitted to charge in the absence of this section,* such institution may, notwithstanding any state constitution or statute which is hereby preempted for the purposes of this section, take, receive, preserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than one per centum in excess of the discount rate on 90 day commercial paper in effect at the Federal Reserve Bank and the federal reserve district where such institution is located or at the rate allowed by the laws of the state, territory, or district where such institution is located, whichever may be greater." (emphasis added).

territory or district where such institution is located. Our interpretation rests upon the statutory language, which lends itself to this construction; Congressional intent; and the interpretation of the Federal Home Loan Bank Board (FHLBB), the regulatory agency charged with overseeing the regulation of federally insured financial institutions. The result of our interpretation of § 1730g(a) in this case is that Illinois usury law both governs the loan to Gavey and, because it was a business loan for which Illinois specifies no interest ceiling, vindicates the transaction from a usury standpoint.

Section 1730g(a) is nearly identical to those provisions regulating interest limits for state-chartered federally insured banks, 12 U.S.C. § 1831d, and federally insured credit unions, 12 U.S.C. § 1785(g)(1). All three provisions were passed as part of the Depository Institutions Deregulation and Monetary Control Act of 1980. Congress passed the applicable provisions of DIDMCA in 1980, when interest rates stood at record levels, in order to assure that borrowers could obtain credit in states with low usury limits and that federally-insured state lending institutions would not be competitively disadvantaged by those usury rates. Without federal legislation, such institutions were being battered by competition from national banks that were allowed to charge higher rates of interest by federal law. See, e.g., 126 Cong.Rec. § 6907 (March 27, 1980) (statement of Sen. Bumpers). Indeed, § 1831d—the first of the three consecutive sections in the DIDMCA —begins with a statement of purpose explicitly confirming its intent to prevent such discrimination.

Congress effectuated its intent by enacting substantially identical language in § 1730g(a), § 1831d and § 1785(g)(1), to that found in 12 U.S.C. § 85, the usury provision governing national banks.[5] Given the similarity of language, the conclusion is virtually compelled that Congress sought to provide federally insured credit institutions with the same "most-favored

lender" status enjoyed by national banks. See Finkelstein, *Most Favored Lender Status for Insured Banks*, 42 Bus.Lawyer 915, 916 (1987). Section 85 was early held to authorize a national bank to charge the rates allowed to the most-favored lender in the state in which it was located. *Tiffany v. Bank of Missouri*, 85 U.S. (18 Wall.) 409, 411, 21 L.Ed. 862 (1874). *See also* 12 C.F. R. § 7.7310 (regulation issued by the Comptroller of the Currency). More recently, more precisely on point, and two years before the DIDMCA was passed, the Supreme Court also clarified that Section 85 allows a nationally chartered bank to "export" the favorable usury rate of its home state to transactions with borrowers from other states. *Marquette National Bank v. First Omaha Service Corp.*, 439 U.S. 299, 313–320, 99 S.Ct. 540, 548–50, 58 L.Ed.2d 534 (1978). Consistent interpretation of § 85 and § 1730g(a) appear warranted, and such interpretation leads to uniformly allowing institutions such as First Financial to export a favorable home-state interest rate.

The Federal Home Loan Bank Board has interpreted § 1730g(a) to harmonize fully with Section 85. The FHLBB's regulation interpreting § 1730g(a) defines the "applicable rate" as the greater of the most favored lender rate under state law or one percent over the Federal Reserve discount rate. 12 C.F.R. § 570.11(a). In addition, the FHLBB general counsel has addressed a situation virtually identical to the present case in a published advisory letter. The general counsel advised that a savings and loan could export the most-favored lender rate of its home state to other states where it may make loans. FHLBB General Counsel Opinion Letter (August 6, 1982). He reasoned that the FHLBB had already recognized the parallel between § 1730g(a) and § 85. 12 C.F.R. § 570.11(a). To the extent that § 1730g(a) is ambiguous, this FHLBB interpretation is entitled to deference provided it is reasonable. *Chevron U.S.A. v. Natural Resources Defense*

---

**5.** The key language of all four provisions is the same, allowing the applicable lender to charge interest at the greater of one percent in excess of the Federal Reserve discount rate or the rate allowed by state law where the lender is located.

*Council,* 467 U.S. 837, 843–4, 104 S.Ct. 2778, 2781–2, 81 L.Ed.2d 694 (1984). Although, as will be seen, the argument for ambiguity in the statutory language is weak, we find FHLBB's reading of the statute reasonable.

Gavey contends, however, that § 1730g(a) is inapplicable to this case by its terms. It contends that the provision's initial conditional clause (Gavey calls this the "triggering clause") is not satisfied, because the "applicable rate" that may be charged by First Financial does *not* exceed the Texas usury rate that First Financial would have been permitted to charge absent § 1730g(a). This argument depends upon construing the "applicable rate" as only one percent in excess of the discount rate on 90–day commercial paper, instead of either that rate *or* the rate of Illinois where Gavey is located.

Gavey's statutory construction, although clever, seems counterintuitive to the language of § 1730g(a). Gavey's interpretation is, however, arguably adopted in *In re: Lawson Square,* 816 F.2d 1236 (8th Cir. 1987). There, an Arkansas lender lent an Arkansas borrower funds to purchase an Arkansas apartment complex, with the loan secured by a first mortgage on the complex. Arkansas's most-favored lender interest rate for such a mortgage was the Federal Reserve discount rate plus five percent, and the parties contracted for interest at the 90–day treasury bill rate plus four percent. The contract rate turned out to exceed the Arkansas usury limit for the period of the loan.

The Eighth Circuit found that the loan was saved by two provisions of the DIDM-CA—§ 1730g(a) and 12 U.S.C. § 1735f–7. Section 1735f–7 overrides state usury limits for mortgages secured by first liens on residential real property. Thus, no usury limit applied to the loan because of § 1735f–7. The court's discussion of

§ 1730g(a) can, in light of the overriding applicability of § 1735f–7,[6] be seen as mere dicta. The court stated nevertheless that § 1730g(a) is inapplicable because the conditional clause of that provision was not met. In addition, the court stated that the "applicable rate" referred to in the conditional clause of § 1730g(a) is the federal discount rate plus one percent. However, the Eighth Circuit was faced with a considerably different set of facts than confronts this court, and we believe that they would not literally apply that phrasing in our context. In *Lawson,* the interest rate that was permitted in the absence of § 1730g(a) and the rate allowed by the state where the lender was located were the same. Additionally the Eighth Circuit neither made mention of statutory history nor noted the FHLBB regulation, because no question of "exportation" of rates under § 1730g(a) was in issue. *Lawson* is thus, we conclude, distinguishable.

Gavey alternatively asserts that § 1730g(a) must be interpreted differently from § 85, because the conditional clause in § 1730g(a) is not present in § 85. Relatedly, Gavey contends that the conditional clause would have no meaning if the "applicable rate" is interpreted as including the rate where the savings and loan institution is located. We disagree. Gavey's error lies in the assumption that Congress *must* have intended a different interest ceiling for federally insured savings and loans because it used a conditional clause in addition to the language of 12 U.S.C. § 85. Rather, § 1730g(a) can be seen as simply providing a more exacting formulation than § 85 of Congress's intent to aid federally insured financial institutions. Section 85 does not explicitly provide for the exportation of a national bank's home-state interest rate to other states in which it does business, but the Supreme Court construed § 85 to reach this result in *Marquette,* 99 S.Ct. 540. Similarly, the conditional clause

**6.** The holding that § 1730g(a) did apply to that loan would not have had any effect on the outcome of *Lawson,* because the DIDMCA provides that a lender is entitled to charge the

higher rate where § 1730g and § 1735f–7 conflict. 12 U.S.C. § 1735f–7 note (Choice of Highest Applicable Interest Rate).

can also be seen as allowing a savings and loan to "import" the favorable interest rates of another state to itself when it lends funds to a borrower in that state. Thus, far from being "meaningless," as Gavey asserts, our construction of § 1730g(a) fully and accurately conforms it to the national banks' most-favored lender status as it is currently understood.

■ Finally, Gavey contends that § 1730g(a) is inapplicable to this case, inasmuch as the parties have contracted out of the federal provision by specifically choosing Texas law in their loan agreements. Based on the inartful choice of law provisions in the documents, this assumption may be dubious. Even accepting Gavey's contention, however, the Supreme Court has rejected such an argument in *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 157, 102 S.Ct. 3014, 3024, 73 L.Ed.2d 664 (1982). In that case, purchasers of property encumbered by deeds of trust sought to bar savings and loan associations from exercising due on sale clauses which were contrary to state law even though regulations of the FHLBB allowed such clauses. The land purchasers argued that their deeds of trust were to be governed by the law of the jurisdiction where the property was located. The Supreme Court held that the "law of the jurisdiction" includes federal as well as state law. Thus, if the parties in this case chose Texas law, federal law in the form of § 1730g(a) still applies.

For these reasons, the judgment of the district court is AFFIRMED.