**GREENWOOD TRUST COMPANY,**
**Plaintiff, Appellant,**

v.

**COMMONWEALTH OF MAS-**
**SACHUSETTS, et al., De-**
**fendants, Appellees.**

**Nos. 91–2205, 92–1065 and 92–1150.**

United States Court of Appeals,
First Circuit.

Heard June 3, 1992.

Decided Aug. 6, 1992.

Arthur R. Miller, with whom Andrew F. Lane, Gilbert R. Hoy, Jr., Warner & Stackpole, Burt M. Rublin, Wolf, Block, Schorr and Solis–Cohen, Alan R. Feldman, and Sullivan & Worcester were on brief, for plaintiff, appellant.

Ernest L. Sarason, Jr. and William T. Matlack, Asst. Attys. Gen., with whom Scott Harshbarger, Atty. Gen., and Sarah Wald, Sp. Asst. Atty. Gen., were on brief, for defendants, appellees.

Frank Max Salinger and Robert E. McKew on brief for American Financial Services Ass'n, amicus curiae.

Arnold M. Lerman, Christopher R. Lipsett, John B. Bellinger, III, Kenneth L. Chernof, and Wilmer, Cutler & Pickering on brief for Bank of America, et al., amici curiae.

John J. Gill, Michael F. Crotty, and Irving D. Warden on brief for American Bankers Ass'n, amicus curiae.

Ralph J. Rohner, Marcia Z. Sullivan, and Steven I. Zeisel on brief for Consumer Bankers Ass'n, amicus curiae.

* Of the Eighth Circuit, sitting by designation.
** Of the District of Puerto Rico, sitting by desig-

L. Richard Fischer, Robert M. Kurucza, Steven S. Rosenthal, James A. Huizinga, and Morrison & Foerster on brief for Visa U.S.A., Inc. and Mastercard Intern. Inc., amici curiae.

Alfred J.T. Byrne, General Counsel, Douglas H. Jones, Sr. Deputy General Counsel, Thomas A. Schulz, Asst. General Counsel, Colleen B. Bombardier, Sr. Counsel, and Lisa M. Miller, Counsel, on brief for F.D.I.C., amicus curiae.

Marsha Kramarck, Deputy Atty. Gen., on brief for Delaware State Bank Com'r, amicus curiae.

Richard P. Eckman, Daniel I. Prywes, Joseph L. Lakshmanan, and Pepper, Hamilton & Scheetz on brief for Delaware Bankers Ass'n, amicus curiae.

Lee Fisher, Atty. Gen. (Ohio) and Kathleen McDonald O'Malley, Chief Counsel, Office of Atty. Gen., on brief for States of Ohio, Ariz., Ill., La., Nev., S.D. and Utah, amici curiae.

Bonnie J. Campbell, Atty. Gen. (Iowa), and Peter R. Kochenburger, Asst. Atty. Gen., on brief for States of Ark., Colo., Conn., Hawaii, Idaho, Iowa, Kan., Ky., Maine, Minn., N.J., N.C., Pa., R.I., S.C., Tex., Vt., W.Va. and the District of Columbia, amici curiae.

Michael M. Malakoff, Ellen Doyle, Malakoff, Doyle & Finberg, Nicholas E. Chimicles, Michael D. Donovan, Robin Resnick and Greenfield & Chimicles on brief for Bankcard Holders of America, et al., amici curiae.

James C. Sturdevant, Kim E. Card, Sturdevant & Sturdevant, and Gail Hillebrand on brief for Consumer Action and Consumers Union, amici curiae.

Albert Endsley, Steven W. Hamm, and Philip S. Porter on brief for National Ass'n of Consumer Credit Administrators and American Conference of Uniform Consumer Credit Code States, amici curiae.

Before SELYA, Circuit Judge, LAY,* Senior Circuit Judge, and PIERAS,** District Judge.

nation.

SELYA, Circuit Judge.

This train wreck of a case arises out of a headlong collision between a state consumer-protection law and a federal banking law. It brings into sharp focus the tensions inherent in our federalist system while presenting a novel legal question: can a federally insured bank, chartered in Delaware, charge its Massachusetts credit-card customers a late fee on delinquent accounts, notwithstanding a Massachusetts statute explicitly prohibiting the practice? The district court answered this question in the negative, enforcing the state statute and granting partial summary judgment in appellees' favor. Because we believe that the lower court was on the wrong track, we reverse. Federal law has the right of way in this area.

## I.

### Background

The pertinent facts are largely undisputed. Plaintiff-appellant Greenwood Trust Company (Greenwood) is a Delaware banking corporation. Its deposits are insured by the Federal Deposit Insurance Corporation. Through a wholly owned subsidiary, Greenwood offers an open end credit card—the Discover Card—to customers nationwide. More than one hundred thousand of its cardholders live in Massachusetts.

The terms and conditions applicable to use of the Discover Card are spelled out in a Cardmember Agreement. The Agreement stipulates, *inter alia*, that the holder must make a minimum monthly payment, calculated by reference to the credit-card balance outstanding from time to time, on or before a designated due date. Failure to make this payment in a timeous fashion constitutes a default. If the default is not cured within twenty days, a ten-dollar late charge is automatically assessed.

On October 27, 1989, the Commonwealth of Massachusetts advised Greenwood that its imposition of late charges under such circumstances contravened state law. The Commonwealth threatened to take legal action. Greenwood promptly launched a preemptive strike, filing a complaint for declaratory and injunctive relief in the United States District Court for the District of Massachusetts.[1] The Commonwealth denied that federal law preempted the Massachusetts statute. It also counterclaimed, seeking to bar Greenwood from assessing late charges and to collect restitutionary damages, together with civil penalties, referable to Greenwood's defiance of state law.

The district court adjudicated the parties' competing claims on cross-motions for summary judgment. Discerning no federal preemption, the court ruled that Massachusetts law applied. Since the court interpreted that law to forbid Greenwood's imposition of late charges upon cardholders who lived in Massachusetts, it denied Greenwood's motion and granted partial summary judgment in the Commonwealth's favor. *Greenwood Trust Co. v. Massachusetts*, 776 F.Supp. 21 (D.Mass.1991). The district court certified its rulings for interlocutory appeal under 28 U.S.C. § 1292(b) (1988). In light of the pivotal importance and broad commercial consequence of the questions presented, we accepted the certification. (As an aside, we remark that our belief as to the importance of the questions presented has been validated to some degree by the outpouring of amicus briefs, some favoring appellant's position and some opposing it.) These appeals ensued.[2]

## II.

### The Statutory Scheme

Two statutes lay at the heart of the dispute between these protagonists: the state law that prohibits the imposition of late fees by credit-card issuers, viz., Mass.

---

1. Greenwood's suit invoked the Supremacy Clause of the federal Constitution. The Commonwealth and its Attorney General were named as defendants. For simplicity's sake we refer to both defendants as "the Commonwealth."

2. Endeavoring to ensure that its flanks are fully protected, Greenwood has prosecuted three separate appeals, each with a different jurisdictional thrust. It is not necessary for us to distinguish among them.

Gen.L. ch. 140, § 114B (1991) (Section 114B), and the federal law which arguably preempts the state statute, viz., Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA), Pub.L. No. 96–221, 94 Stat. 132 (1980) (codified, as amended, in scattered sections of the U.S.Code). This case demands that we determine whether section 114B's immovable prohibition survives section 521's irresistible preemptive sweep.

The Massachusetts statute is straightforward. It provides that: "No creditor shall impose a delinquency charge, late charge, or similar charge on loans made pursuant to ... an open end credit plan." Mass. Gen.L. ch. 140, § 114B.

On the other hand, section 521 is equally uncompromising:

> In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, ... with respect to interest rates, ... such State bank[s] ... may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank ... is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a) (1988 & Supp.1990).

### III.

### *Discussion*

### A.

### *Preemption: General Principles*

■ In *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), Chief Justice

Marshall declared that, under the rubric of the Supremacy Clause,[3] state laws which "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are preempted and, therefore, invalid. *Id.* 22 U.S. (9 Wheat.) at 211. This verity remains firmly embedded in our modern jurisprudence. *See, e.g., Wisconsin Pub. Intervenor v. Mortier,* —— U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991); *Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2374, 85 L.Ed.2d 714 (1985); *Securities Indus. Ass'n v. Connolly,* 883 F.2d 1114, 1117 (1st Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990).

■ In placing constitutional theory into practice, the Court has generally distinguished between express and implied preemption. Express preemption occurs "when Congress has 'unmistakably ... ordained' that its enactments alone are to regulate a [subject, and] state laws regulating that [subject] must fall." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)). In such instances, the only remaining question is whether a particular state statute intrudes into the federal pale. *See Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988); *Cable Television Ass'n v. Finneran,* 954 F.2d 91, 98 (2d Cir.1992).

■ Implied preemption comes in a wide variety of sizes and shapes. Indeed, we have said that "[t]he concept ... has a certain protean quality, which renders pigeonholing difficult." *French v. Pan Am Express, Inc.,* 869 F.2d 1, 2 (1st Cir.1989). Implied preemption can occur when Con-

---

**3.** The Supremacy Clause provides that:
> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land;

and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const., art. VI, cl. 2.

gress constructs a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"; or when an "Act of Congress ... touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; or when the goals of, and obligations imposed by, the federal law make manifest a purpose to uproot state law. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *accord Mortier*, —— U.S. at ——, 111 S.Ct. at 2481–82; *English v. General Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). Implied preemption can also occur in situations involving actual conflicts, such as when compliance with both federal and state regulation is an impossibility, *see, e.g., Florida Lime*, 373 U.S. at 142–43, 83 S.Ct. at 1217–18, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Certain common strands bind these diverse species of express and implied preemption together. Two such threads run through the fabric of the instant case. For one thing, in any preemption analysis, "the question of whether federal law preempts a state statute is one of congressional intent." *French*, 869 F.2d at 2; *accord Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, ——, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); *Securities Indus.*, 883 F.2d at 1117. For another thing, the different strains of preemption all operate on "the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice*,

331 U.S. at 230, 67 S.Ct. at 1152; *see also Mortier*, —— U.S. at ——, 111 S.Ct. at 2482; *California v. ARC America Corp.*, 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Courts must tread cautiously in this arena because the authority to displace a sovereign state's law is "an extraordinary power.... that we must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, —— U.S. ——, ——, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). Even federal statutes that contain express preemption clauses must be viewed through the prism of this assumption. *See Cipollone v. Liggett Group, Inc.*, —— U.S. ——, —— ——, 112 S.Ct. 2608, 2615–19, 120 L.Ed.2d 407 (1992) (plurality opinion); *id.* at ——, 112 S.Ct. at 2625 (Blackmun, J., concurring in part and dissenting in part).

B.

*The Track We Must Travel*

We move now from the general to the particular. Section 521 boasts an express preemption clause. In recent days, the High Court has made it pellucidly clear that, whenever Congress includes an express preemption clause in a statute, judges ought to limit themselves to the preemptive reach of that provision without essaying any further analysis under the various theories of implied preemption. *See Cipollone*, —— U.S. at ——, 112 S.Ct. at 2617 (plurality opinion); *id.* at ——, 112 S.Ct. at 2625 (Blackmun, J., concurring in part and dissenting in part). Given the teachings of *Cipollone* and the plain language of section 521 ("notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section"), we reject the Commonwealth's contention that this is an implied preemption case.[4]

---

4. The district court apparently accepted the Commonwealth's position and treated the case as one of implied preemption. *See Greenwood Trust*, 776 F.Supp. at 30. It is likely that this error derived from the miasma of doubt surrounding the applicability of section 521 in Massachusetts. The district court believed that the Commonwealth had exercised its right, under section 525 of DIDA, 12 U.S.C. § 1730g note (since repealed by Title IV of FIRREA, Pub.L. No. 101–73, 103 Stat. 183, 363 (1989)), to opt out

of section 521's preemptive grasp. *See, e.g., Greenwood Trust*, 776 F.Supp. at 24 n. 6, 26, 30 & n. 24, 35. The court overlooked, however, that although Massachusetts opted out in 1981, *see* 1981 Mass. Acts 231, it reversed direction and, in effect, opted back in well before this litigation began. *See* 1986 Mass. Acts 177 (repealing pertinent portions of 1981 Mass. Acts 231). Section 521 is, therefore, fully applicable to the instant case.

■ Our conclusion that the proper analysis in this case reduces to an inquiry into express preemption is unaffected by the fact that the inquiry requires us to interpret the terms "interest" and "interest rates" as they are employed in section 521. While uncertainty about the meaning of interstitial terms in the text of a federal statute may affect the scope of express preemption, it does not bear directly on the character of Congress's preemptory intent. *See Cipollone*, — U.S. at —, 112 S.Ct. at 2617–25 (plurality opinion); *id.* at —, 112 S.Ct. at 2625–31 (Blackmun, J., concurring in part and dissenting in part); *Cable Television*, 954 F.2d at 98. In other words, so long as Congress's intent to effect preemption remains clear and manifest, uncertainty which pertains only to the contours of the ensuing preemption does not necessitate an alteration of a reviewing court's basic analytic approach.

### C.

*The Scope of Express Preemption under Section 521*

We must still resolve the crucial question of *what* state laws are preempted. Put specifically, is a state law banning the imposition of late charges a law regulating "interest" within the purview of section 521? If so, chapter 140, § 114B is preempted.

■ This inquiry necessarily reduces to ascertaining what Congress meant by the word "interest" in drafting section 521. In divining this legislative intent, it is incumbent upon us to "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Morales v. Trans World Airlines, Inc.*, — U.S. —, —, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, —, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990)). In the process, however, we should not wear blinders: if there is "good reason to believe" that Congress intended to deviate from the ordinary meaning of the language selected, then a reviewing court must follow the congressional lead. *Cipollone*, —

U.S. at —, 112 S.Ct. at 2619 (plurality opinion) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983)); *see also American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982).

■ Should perlustration of a statute's text fail to disclose the scope of Congress's preemptory intent, we must then assess the statute's structure and purpose in order to probe Congress's wishes. *Ingersoll–Rand*, 498 U.S. at —, 111 S.Ct. at 482; *FMC Corp.*, 498 U.S. at —, 111 S.Ct. at 407. Moreover, a court, faced with the necessity of delineating a facially cryptic statute's preemptive scope, can repair to statutory history and legislative context in order to facilitate its inquiry into congressional purpose. *See Toibb v. Radloff*, — U.S. —, —, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991); *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

### 1.

■ The Commonwealth urges, and the lower court determined, *Greenwood Trust*, 776 F.Supp. at 36–38, that section 521's language plainly limits its preemptory impact to state laws that govern numerical interest rates, thereby leaving state laws regulating flat fees unscathed—even when, as here, such fees arise out of the extension and maintenance of credit. We are not persuaded that the plain meaning of "interest" and/or "interest rates" as used in section 521 requires so grudging an interpretation.

In the first place, we do not believe that the plain meaning of "interest" necessarily restricts the definition of the word to numerical percentage rates. Reference works typically define interest as "a charge for borrowed money[,] *generally* a percentage of the amount borrowed." *Webster's Ninth New Collegiate Dictionary* 630 (1989) (emphasis supplied); *see also Black's Law Dictionary* 812 (6th ed. 1990). Such definitions do not limit interest to numerical percentage rates, for they simply note that interest is often, but not always, expressed as a percentage. If the Common-

wealth's circumscribed view of the word were accurate, there would be no basis for suggesting that exceptions exist.

Judicial opinions also tend to shy away from limiting the word "interest" to numerical percentage rates. Specifically, federal case law has long suggested that, in ordinary usage, interest may encompass late fees and kindred charges.[5] *See, e.g., Shoemaker v. United States,* 147 U.S. 282, 321, 13 S.Ct. 361, 394, 37 L.Ed. 170 (1893) ("Interest accrues either by agreement of the debtor to allow it for the use of money, or, in the nature of damages, by reason of the failure of the debtor to pay the principal when due."); *Brown v. Hiatts,* 82 U.S. (15 Wall.) 177, 185, 21 L.Ed. 128 (1873) ("[i]nterest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention").

Thus, the door is open to appellant's interpretation of the term. Suggesting that an additional fee attached to a delinquent, defaulted account is related to the creditor's cost of lending that money does no violence to language, to precedent, or, indeed, to logic. Default necessarily increases the creditor's cost of processing a loan. Therefore, a late fee is sufficiently related to the "use or forbearance of money, or … damages for its detention" that it can appropriately be classified as "interest."

■ In the second place, the use of words like "rate" in conjunction with the word "interest" does little to advance the Commonwealth's thesis. While there may exist support for the assertion that a flat fee is not included in the plain meaning of terms such as "rate" and "interest rates," section 521's preemptive reach cannot so easily be restricted to numerical percentage rates. Terms in an act whose meaning may appear plain outside the scheme of the statute can take on a different meaning

when read in their proper context. *See United Steelworkers of America v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979); *Train v. Colorado Pub. Interest Research Group, Inc.,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976). As Judge Learned Hand once wrote, words can be "chameleons, which reflect the color of their environment." *Commissioner v. National Carbide Corp.,* 167 F.2d 304, 306 (2d Cir.1948), *aff'd,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).

■ In short, the plain-meaning doctrine is not a pedagogical absolute. This rule of construction is more "an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence" in contradiction to supposedly plain meaning if such evidence exists. *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.). Hence, a court must always hesitate to construe words in a statute according to their apparent meaning if to do so would defeat Congress's discovered intendment. *See Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983); *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). It follows that:

deference to the plain meaning rule should not be unthinking or blind. We would go beyond the plain meaning of the statutory language when adherence to it would produce an absurd result or an unreasonable one plainly at variance with the policy of the legislation as a whole.

*Massachusetts Fin. Servs., Inc. v. Securities Investor Protection Corp.,* 545 F.2d 754, 756 (1st Cir.1976) (citations and internal quotation marks omitted), *cert. denied,*

5. Since we are interpreting the terms of a federal statute in a dispute between Massachusetts and a Delaware bank, we do not believe that definitions of interest emanating from courts in other states are relevant to our inquiry, except insofar as those cases purpose to interpret DIDA or its forebears. In any event, such state-law definitions go both ways. *Compare, e.g., Perry*

*v. Stewart Title Co.,* 756 F.2d 1197, 1207–08 (5th Cir.1985) (under Texas law, late charges are not a component of interest) *with, e.g., Swindell v. Federal Nat'l Mortgage Ass'n,* 330 N.C. 153, 409 S.E.2d 892, 894–95 (1991) (under North Carolina law, late charges are a component of interest).

431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *accord In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2060, 56 L.Ed.2d 591 (1978).

Viewed as part of this mise-en-scene, the Commonwealth's plain-meaning argument cannot carry the day. The argument gathers little steam because the use of the terms "interest" and "interest rates" in section 521 is an example of how phrases' meanings can take on different colorations when read in their legislative and historical context. Accordingly, we must move beyond the plain-meaning doctrine to determine the scope of express preemption under section 521.

### 2.

The preamble to section 521 states that the law was created "to prevent discrimination against State-chartered insured depository institutions, including insured savings banks." To understand the reference, we examine the historical context.

As the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch. Interest rates soared. *See, e.g., United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 764 n. 20 (1st Cir.1985) (cataloguing fluctuations in the prime rate from 1975 to 1983). Nevertheless, state lending institutions were constrained in the interest they could charge by state usury laws which often made loans economically unfeasible from a lender's coign of vantage. *See Gavey Properties/762 v. First Fin.*

*Sav. & Loan,* 845 F.2d 519, 521 (5th Cir. 1988); *Bank of New York v. Hoyt,* 617 F.Supp. 1304, 1309 (D.R.I.1985). National banks did not share this inhibition because they could charge whatever interest rates were allowed under the National Bank Act of 1864, ch. 106, 13 Stat. 99 (1864) (codified, as amended, in scattered sections of 12 U.S.C.) (the Bank Act), and specifically, those rates which were permitted under Bank Act § 85, 12 U.S.C. § 85 (1988), quoted *infra* note 7. Since section 85 authorized national banks to use interest rates set by reference to federal discount rates, state institutions were at an almost insuperable competitive disadvantage.[6]

Congress tried to level the playing field between federally chartered and state-chartered banks when it enacted DIDA. *See* 126 Cong.Rec. 6,907 (1980) (section 521 will "allow[ ] competitive equity among financial institutions, and reaffirm[ ] the principle that institutions offering similar products should be subject to similar rules") (statement of Sen. Bumpers); 126 Cong. Rec. 6,900 (1980) (section 521 should "provide[ ] parity, or competitive equality, between national banks and State[-]chartered depository institutions on lending limits") (statement of Sen. Proxmire). To achieve this objective, Congress engrafted onto DIDA's bare bones, at several points, language taken from the Bank Act. Section 521, modeled on section 85 of the Bank Act, was the site of one such transplantation.[7]

---

**6.** Section 85 was originally enacted to shield national banks from state laws that were discriminating against them. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 314–18, 99 S.Ct. 540, 548–50, 58 L.Ed.2d 534 (1978); Cong. Globe, 38th Cong., 1st Sess. 2126 (1864) (statement of Sen. Sherman). More than a century later, this shield had become a sword wielded by national banks against state-chartered lenders. As we have written before, "irony is no stranger to the law." *Amanullah v. Nelson,* 811 F.2d 1, 18 (1st Cir.1987).

**7.** We consider the transplanted language to be the following:

> [A state-chartered, federally insured depository institution], with respect to interest rates, ... may ... take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per

centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank ... is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a) (DIDA § 521). The comparison between this language and the language of section 85 is striking. The latter provided in relevant part:

> [A national bank] may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal re-

The parallelism was not mere happenstance. To the exact contrary, Congress made a conscious choice to incorporate the Bank Act standard into DIDA. *See, e.g.,* 126 Cong.Rec. 6,907 (1980) (statement of Sen. Bumpers); 125 Cong.Rec. 30,655 (1979) (statement of Sen. Pryor); *see also Gavey,* 845 F.2d at 521.

 The historical record clearly requires a court to read the parallel provisions of DIDA and the Bank Act *in pari materia.* It is, after all, a general rule that when Congress borrows language from one statute and incorporates it into a second statute, the language of the two acts should be interpreted the same way. *See Morales,* —— U.S. at ——, 112 S.Ct. at 2037; *Ingersoll–Rand,* 498 U.S. at ——, 111 S.Ct. at 485–86; *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979). So here. What is more, when borrowing of this sort occurs, the borrowed phrases do not shed their skins like so many reinvigorated reptiles. Rather, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 537 (1947). Because we think it is perfectly plain that this portable soil includes prior judicial interpretations of the transplanted language, *see Holmes v. Securities Investor Protection Corp.,* —— U.S. ——, ——–——, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992); *Pierce v. Underwood,* 487 U.S. 552, 567, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988); *Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978), Bank Act precedents must inform our interpretation of words and phrases that were lifted from the Bank Act and inserted into DIDA's text.

 While we believe that several principles inherent in section 85 were transfused into section 521, the critical item for present purposes is the principle of exportation. This principle, solidly embedded in the language and purpose of both acts, provides the mechanism whereby a bank may continue to use the favorable interest laws of its home state in certain transactions with out-of-state borrowers.[8] *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 313–19, 99 S.Ct. 540, 548–51, 58 L.Ed.2d 534 (1978); *Gavey,* 845 F.2d at 521. To the extent that a law or regulation enacted in the borrower's home state purposes to inhibit the bank's choice of an interest term under section 521, DIDA expressly preempts the state law's operation.

Read in this way, the language borrowed from Bank Act § 85 and incorporated into DIDA § 521 achieves parity between national banks and their state-chartered counterparts by allowing lenders such as Greenwood to choose among three interest rate ceilings: (1) the highest rate lawfully permitted without reference to section 521; (2) a rate not more than one percent above the discount rate on 90–day commercial paper in effect at the Federal Reserve Bank in the federal reserve district where the lender is located; or (3) the highest rate allowed by the laws of the state where the lender is located. Section 521's express preemption clause is designed to maintain this parity. Acting in combination with the principle of exportation, this clause necessarily derails any state-sponsored attempt to regulate the maximum interest chargeable by a federally insured bank chartered in another state. For our purposes, this means that any Massachusetts law applicable to Greenwood must yield to the preemptory force of section 521 insofar as the regulation of "interest" is concerned.

---

serve district where the bank is located, whichever may be the greater. . . .
12 U.S.C. § 85 (1988) (Bank Act § 85). Although there are niggling variations, the key phraseology is substantially identical. *Accord Gavey,* 845 F.2d at 521 (interpreting 12 U.S.C. § 1730g(a), a section of DIDA containing language parallel to section 521).

**8.** The exportable rates are those available to the most favored lenders in the bank's state, not merely those available to lenders of a similar size, character, or function. *See Tiffany v. National Bank of Missouri,* 85 U.S. (18 Wall.) 409, 411–13, 21 L.Ed. 862 (1874).

We reach this conclusion mindful of the fact that the state statute here at issue visits two areas which are squarely within the ambit of the states' historic powers—banking, *see, e.g., Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve Sys.*, 472 U.S. 159, 177, 105 S.Ct. 2545, 2555, 86 L.Ed.2d 112 (1985); *Valley Bank v. Plus Sys., Inc.*, 914 F.2d 1186, 1195 (9th Cir.1990), and consumer protection. *See, e.g., ARC America*, 490 U.S. at 101, 109 S.Ct. at 1665; *General Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir.1990). Although this circumstance means that any preemption provision must be construed cautiously and with due regard for state sovereignty, *see Cipollone*, —— U.S. at —— - ——, 112 S.Ct. at 2615–19 (plurality opinion); *id.* at ——, 112 S.Ct. at 2625 (Blackmun, J., concurring in part and dissenting in part), it does not serve as a buckler against the force of the Supremacy Clause. When Congress has acted within its authority and its intent to displace state law is clear—preconditions which obtain here—preemption is not foreclosed by the fact that the federal statute intrudes into the range of subjects over which the states have traditionally exercised their police powers.[9] *See Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

### 3.

To be sure, the impuissance of the Commonwealth's plain-meaning argument signifies only that the terms "interest" and "interest rates" as used in section 521 are susceptible to interpretation—not that the Commonwealth's interpretation of those terms is necessarily wrong or that the appellant's interpretation is necessarily correct. To like effect, our recognition of DIDA's ancestry, while illuminating, provides us with no definitive answer to the precise question at hand. Since DIDA's text and legislative history are, at bottom, inconclusive, we must look either to federal common law or to state law to give content to the terms in question.

In general, the words and phrases contained in a federal statute are defined by reference to federal law. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43, 109 S.Ct. 1597, 1605, 104 L.Ed.2d 29 (1989); *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1943). There are two compelling reasons for adhering to this praxis. First, application of state-law definitions may threaten the policies or interests which a federal statute is designed to serve. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979); *Burks v. Lasker*, 441 U.S. 471, 479, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404 (1979). Second, application of state-law definitions may disrupt Congress's desire for nationwide uniformity under a federal statute. *See Kamen v. Kemper Fin. Servs., Inc.*, —— U.S. ——, ——, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991); *Mississippi Band*, 490 U.S. at 43–44, 109 S.Ct. at 1605–06.

Resort to uniquely federal definitions is not, however, automatic. "Congress sometimes intends that a statutory term be given content by the application of state law." *Mississippi Band*, 490 U.S. at 43, 109 S.Ct. at 1605. In such instances, a federal court may properly use state law to fill the interstices within a federal legislative scheme. *See, e.g., Kamen*, —— U.S. at ——, 111 S.Ct. at 1722–23 (holding it proper to borrow a definition from state corporate law); *Mississippi Band*, 490 U.S. at 47–53, 109 S.Ct. at 1607–11 (allowing state-law definition of "domicile" to inform a federal definition); *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 204–05, 103 S.Ct. 552, 557–58, 74 L.Ed.2d 364 (1982) (similar, in corporate-law context); *De Sylva v. Ballentine*, 351 U.S. 570, 580–81, 76 S.Ct. 974, 979–80, 100 L.Ed. 1415 (1956) (borrowing definition from state domestic relations law); *Recon-*

---

**9.** By the same token, the relative importance of a state law to a state sovereign is immaterial when that law is displaced by a valid federal statute, for the Framers provided that the federal law must prevail. *See Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962).

*struction Fin. Corp. v. Beaver County,* 328 U.S. 204, 208–10, 66 S.Ct. 992, 994–96, 90 L.Ed. 1172 (1946) (borrowing definition from state property law). This "does not mean that a State would be entitled to use [a statutory term] in a way entirely strange to those familiar with its ordinary usage, but at least to the extent that there are permissible variations in the ordinary concept [of that term] we [may] deem state law controlling." *De Sylva,* 351 U.S. at 581, 76 S.Ct. at 980.

In this case, we need not decide whether federal or state law is the appropriate point of reference. Since both sources produce the same result, it would be a mere matter of form—and idle—to choose between them. *See Royal Business Group, Inc. v. Realist, Inc.,* 933 F.2d 1056, 1064 (1st Cir. 1991) (eschewing choice of law where, whatever the choice, the result of the litigation would not be affected); *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1092 (1st Cir.1989) ("When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter."). We illustrate briefly.

#### a.

Section 521 allows a state bank to charge interest "at the rate allowed by the laws of the State ... where the bank is located." We think this is a fairly clear indication that, if a state-law definition of interest is applicable, it must emanate from Delaware law. We so hold, much bolstered by the recognition that section 85 "adopts the entire case law of [a state bank's home] state interpreting the state's limitations on usury; it does not merely incorporate the numerical rate adopted by the state." *First Nat'l Bank v. Nowlin,* 509 F.2d 872, 876 (8th Cir.1975); *accord Roper v. Consurve, Inc.,* 777 F.Supp. 508, 510–11 (S.D.Miss. 1990), *aff'd,* 932 F.2d 965 (5th Cir.) (table), *cert. denied,* —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 142 (1991). Our conclusion is further fortified by the knowledge that several other federal tribunals, in addition to the *Nowlin* and *Roper* courts, have interpreted identical language in section 85 of the Bank Act as adopting definitions drawn from the law of the state where the bank is located. *See, e.g., Daggs v. Phoenix Nat'l Bank,* 177 U.S. 549, 555, 20 S.Ct. 732, 735, 44 L.Ed. 882 (1900); *Union Nat'l Bank v. Louisville, N.A. & C. Ry.,* 163 U.S. 325, 331, 16 S.Ct. 1039, 1042, 41 L.Ed. 177 (1896); *NCNB Nat'l Bank v. Tiller,* 814 F.2d 931, 937 (4th Cir.1987), *overruled on other grounds by Busby v. Crown Supply, Inc.,* 896 F.2d 833, 840–42 (4th Cir.1990) (en banc); *Bartholomew v. Northampton Nat'l Bank,* 584 F.2d 1288, 1295 (3d Cir. 1978); *McAdoo v. Union Nat'l Bank,* 535 F.2d 1050, 1055–58 (8th Cir.1976); *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 F.2d 855, 861–64 (6th Cir.1972).

Delaware law explicitly incorporates late charges into the definition of interest and allows lenders to assess such fees against credit-card customers. *See* Del.Code Ann. tit. 5, § 950 (1985 & Supp.1990). Thus, were we to look to Delaware law for help in fathoming the meaning of "interest" and "interest rates," late charges would be included. In that event, section 114B's prohibition on late fees would be nullified by section 521's express preemption of state laws limiting exported interest rates.

#### b.

Federal common law brings us to precisely the same result. Several courts, in analyzing the language of section 85 of the Bank Act, have had little trouble in construing the term "interest" to encompass a variety of lender-imposed fees and financial requirements which are independent of a numerical percentage rate. *See, e.g., American Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781, 787–88 (9th Cir. 1982) (compensating balance requirement); *Fisher v. First Nat'l Bank,* 548 F.2d 255, 258–61 (8th Cir.1977) (fee for cash advance); *Panos v. Smith,* 116 F.2d 445, 446–47 (6th Cir.1940) (taxes and recording fees); *Cronkleton v. Hall,* 66 F.2d 384, 387 (8th Cir.) (bonus or commission paid to lender), *cert. denied,* 290 U.S. 685, 54 S.Ct. 121, 78 L.Ed. 590 (1933); *Nelson v. Citibank (South Dakota) N.A.,* 794 F.Supp. 312, 318 (D.Minn.1992) (late fees). Fairly read,

these opinions expand the scope of section 85 preemption—and, by implication, the scope of section 521 preemption—well beyond periodic percentage rates.[10]

While we are aware that many of these cases involve the intrastate extension of loans by national banks rather than the exportation of interest rates, the analogy is persuasive. Furthermore, some of them do involve exportation. For example, *Fisher* concerned a credit-card cash advance fee charged by a Nebraska bank to a customer residing in Iowa. The court suggested that this fee was a component of the "rate of interest," making no distinction between the meaning of "interest" in intrastate, as opposed to interstate, transactions. *Fisher*, 548 F.2d at 258–61. For our part, we can discern no principled basis for such a distinction.

### 4.

■ It is, moreover, obvious that construing the terms "interest" and "interest rates" to include late charges fits most comfortably with the rationale undergirding section 521. DIDA was enacted in order to strike a competitive balance between state and national lending institutions by giving them equal power in charging interest rates. Allowing state banks to charge the same or similar fees in connection with the extension and maintenance of

credit as national banks are allowed to charge ensures parity between the two types of institutions.

Such a construction also finds broad support in the rulings and informal opinion letters of the various agencies charged with interpreting the meaning of section 85 and section 521. *See, e.g.,* 12 C.F.R. § 7.7310(a) (1992) (ruling of the Comptroller of the Currency to the effect that all of a bank's home-state laws "material to the determination of the interest rate" are exportable); Letter by Robert B. Serino, Deputy Chief Counsel of the Office of the Comptroller of Currency, [1988–1989 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 85,676 (Aug. 11, 1988) (concluding that, under Bank Act § 85, state-law prohibition of late charges may be preempted); Letter by Harry W. Quillian, Acting General Counsel of the Federal Home Loan Bank Board 3 (June 27, 1986) (similar; interpreting DIDA § 522).[11]

We need not grease the rails. Given our conclusion that DIDA § 521 should be interpreted *in pari materia* with its direct lineal ancestor, section 85 of the Bank Act, and given, also, the litany of cases extending section 85 to a wide variety of fees and charges associated with the extension and maintenance of credit, we see no reason to define either the term "interest" or the term "interest rates," for purposes of sec-

---

**10.** The court below relied upon the legislative history of DIDA § 501, 12 U.S.C. § 1735f–7a, to support the proposition that late charges are not a component of interest under section 521. *Greenwood Trust*, 776 F.Supp. at 29–32. Congress enacted section 501 as an amendment to the National Housing Act, while section 521 altered the Federal Deposit Insurance Act. The mere fact that both of these sections fell under the broad umbrella of DIDA does not make them fair congeners. Since DIDA contains an amalgam of different provisions, the legislative history and purpose of one section of DIDA does not necessarily inform the interpretation of all other parts of that law. *See Bank of New York*, 617 F.Supp. at 1311–13. As we have stated, "it is not unusual for the same word to have differing connotations in the same act and surely no canon of statutory construction forecloses courts from attributing to the word the meaning which the legislature intended that it should have in each instance." *Sherman v. Hamilton,* 295 F.2d 516, 520 (1st Cir.1961), *cert. denied,*

369 U.S. 820, 82 S.Ct. 827, 7 L.Ed.2d 785 (1962); *see also Dewsnup v. Timm,* —— U.S. ——, —— ——, 112 S.Ct. 773, 777–78, 116 L.Ed.2d 903 (1992). This sentiment seems especially apropos in view of the fact that section 501 addresses different categories of lenders and loans and contains materially different preemption terms than does section 521.

In light of the irrefutable evidence that section 521 was conceived as an offspring of section 85 of the Bank Act, we believe that the district court's reliance upon a comparison between it and DIDA § 501 was misplaced. The proper analogy in this case is to compare lineal descendants who share common language and purpose, not distant cousins who share little more than a name.

**11.** We need not join the parties' heated debate over the level of deference these materials deserve, for we would reach the same result independent of any reliance on them.

tion 521, in a manner that excludes late fees.

## IV.

### *Conclusion*

When Congress furnishes clear and un-equivocal evidence of its preemptory mind-set in the text of a statute, the "task of discerning congressional intent is consider-ably simplified." *Ingersoll–Rand*, 498 U.S. at ——, 111 S.Ct. at 482. Here, section 521 provides with undeniable clarity that usury laws in effect in the borrower's state may be preempted as applied to federally in-sured banks chartered in other states.

With respect to the specific scope of sec-tion 521's preemption, section 85 of the Bank Act long ago laid the track upon which the parties must now travel. Section 85's preemption acts as a cowcatcher by brushing aside states' attempts to regulate "interest rates" charged by national banks. Included within those displaced state laws are regulations regarding flat fees analo-gous to late charges. In passing DIDA, Congress expressly placed section 521 on the same footing. Hence, "interest" in sec-tion 521 encompasses late fees charged to credit-card customers. Section 114B, which prohibits the assessment of late charges, thereby regulates the interest a bank may charge in a more restrictive manner than federal law permits.

We need go no further.[12] For the rea-sons set forth above, it is patent that the state statute is on a collision course vis-a-vis section 521. Given the imperatives of the Supremacy Clause, the whistle sounds loud and clear. Section 114B must yield. It is preempted.

*Reversed.*

---

**12.** Inasmuch as we conclude that section 114B is preempted, we need not confront various other issues addressed by the court below. *See Greenwood Trust*, 776 F.Supp. at 39–47. We take no view of any such issues.