985 F.2d 1438
 61 USLW 2526, Prod.Liab.Rep. (CCH) P 13,466
 Edward Charles CLEVELAND, By and Through the Conservator of
his Estate Kathleen CLEVELAND, Plaintiff-Appellee,
v.
PIPER AIRCRAFT CORPORATION, a corporation, Defendant-Appellant.
Association of Trial Lawyers of America, and General
Aviation Manufacturers Association, Aircraft
Owners and Pilots Association (AOPA),
United States of America. Amici Curiae.
 No. 91-2065.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 16, 1993.
 
 Daniel C. Cathcart of Magana, Cathcart, McCarthy & Pierry, Los Angeles, CA (William G. Gilstrap, of William G. Gilstrap, P.C., Albuquerque, NM, with him on the brief), for plaintiff-appellee.
 David K. Watkiss of Watkiss & Saperstien, Salt Lake City, UT (H. Dickson Burton of Watkiss & Saperstien, Salt Lake City, UT, W.R. Logan of Civerlolo, Hansen & Wolf, P.A., Albuquerque, NM, with him on the brief), for defendant-appellant.
 Michael C. Maher, President, Jeffrey Robert White, for Ass'n of Trial Lawyers of America, Washington, DC, amicus curiae.
 Stuart M. Gerson, Asst. Atty. Gen., Robert V. Zener, Appellate Litigation Counsel, Jeffrey Clair, Atty. Dept. of Justice, Washington, DC, Don V. Svet, U.S. Atty., Albuquerque, NM, Walter B. McCormick, Jr., Gen. Counsel, Paul M. Geier, Asst. Gen. Counsel for Litigation, Dale C. Andrews, Deputy Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., Kenneth P. Quinn, Chief Counsel, James S. Dillman, Asst. Chief Counsel for Litigation, Melanie R. Miller, Atty., Federal Aviation Admin. for the U.S., amicus curiae.
 Stanley J. Green of Dunaway & Cross, Washington, DC (Gary E. Cross, and Matthew F. Hall, with him on the brief), for General Aviation Mfrs. Ass'n, amicus curiae.
 John S. Yodice, of Yodice Associates, Washington, DC (Donald L. Hardison, with him on the brief), and L. Richard Musat, of Treece, Alfrey & Musat, P.C., Denver, CO, for Aircraft Owners and Pilots Ass'n, amicus curiae.
 Before LOGAN, Circuit Judge, LAY, Senior Circuit Judge,[1] and BARRETT, Senior Circuit Judge.
 LAY, Senior Circuit Judge.
 
 
 1
 Piper Aircraft Corporation brings this interlocutory appeal under 28 U.S.C. § 1292(b), challenging pre-trial rulings by the district court. Edward Cleveland brought suit against Piper for injuries he received in 1983 while piloting a Super Cub airplane, which crashed during takeoff. He alleged he suffered severe injuries due to the negligent design of the plane. In May 1986, a jury returned a $2.5 million verdict in favor of Cleveland.[2] On appeal this court determined the special verdict form improperly restricted jurors from allocating fault to all potentially responsible parties. See Cleveland v. Piper Aircraft Corp., 890 F.2d 1540, 1546-51 (10th Cir.1989), reh'g denied, 898 F.2d 778 (10th Cir.1990). A new trial was awarded Piper. On remand, the district court permitted Piper to amend its answer and assert a defense that state common law was preempted by the Federal Aviation Act of 1958 and its corresponding regulations.[3] The district court, among other rulings, denied Piper's motion for summary judgment on this defense. Additionally, the trial court granted plaintiff's motion to limit the second trial to the issue of liability and ruled that only the witnesses and exhibits presented in the first trial could be introduced in the second trial. Piper sought permission to appeal these rulings under 28 U.S.C. § 1292(b); the trial court certified the appeal and this court granted permission.
 
 I. FACTS
 
 2
 Cleveland was injured July 8, 1983 while attempting to take off from the Mid-Valley Airport in Los Lunas, New Mexico, in a Piper Super Cub Model PA-18-150. The plane was towing a glider that was attached by rope to the aircraft's tail. Cleveland and a cinematographer were planning to film the glider's flight for a television commercial. With assistance from a Federal Aviation Administration (FAA) certified mechanic, Cleveland had removed the front pilot's seat from the plane and installed a camera. At the time of the accident, Cleveland was piloting the plane from the rear pilot seat.[4]
 
 
 3
 A few days before Cleveland planned to shoot the commercial, the owner of the Mid-Valley airport became concerned about the safety of the operation and about compliance with FAA regulations. The owner closed the airport to prevent Cleveland from taking off. On the morning of the accident, the owner noticed activity at the airport and parked his van in the runway to prevent takeoffs and landings. Shortly thereafter, Cleveland attempted to fly the reconfigured Piper airplane. During takeoff, the aircraft struck the owner's parked van. Cleveland's head struck the camera, resulting in serious head and brain injuries.
 
 
 4
 Cleveland's wife, the conservator of his estate, brought this diversity action against Piper, which manufactured and sold the Super Cub in 1970. At the conclusion of the trial, a jury determined that Piper negligently designed the aircraft without adequate forward vision from the rear seat and negligently failed to provide a rear shoulder harness. However, the jury was not asked to compare the negligence of the parties responsible for the initial collision--the plane striking the van--with the negligence of those responsible for the second injury--Cleveland's head striking the camera. On this basis, we reversed and ordered a new trial. Id. at 1546.
 
 II. FEDERAL PREEMPTION
 
 5
 Piper claims that the district court erred in denying its motion for summary judgment on preemption grounds. The basic principles of law in this area are well settled. Piper argues that the Federal Aviation Act of 1958, 49 U.S.C.App. §§ 1301 et seq., and the regulations it has spawned impliedly preempt state tort actions by occupying the field of airplane safety. It asserts that the web of federal laws and regulations govern the field in a comprehensive manner, leaving no room for state regulation. Preemption questions turn on congressional intent. Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). The mere fact that Congress has enacted detailed legislation addressing a matter of dominant federal interest does not indicate an intent to displace state law entirely. English v. General Elec. Co., 496 U.S. 72, 87, 110 S.Ct. 2270, 2279, 110 L.Ed.2d 65 (1990); Hillsborough County v. Automated Medical Lab., Inc., 471 U.S. 707, 716-20, 105 S.Ct. 2371, 2376-79, 85 L.Ed.2d 714 (1985). Congress may reserve for the federal government the exclusive right to regulate safety in a given field, yet permit the states to maintain tort remedies covering much the same territory. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 253, 104 S.Ct. 615, 624, 78 L.Ed.2d 443 (1984). This is so even though an award of damages may have the same effect as direct state regulation. See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). The Supreme Court has recently emphasized:
 
 
 6
 Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress."
 
 
 7
 Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).
 
 
 8
 The district court determined the plain language of the Federal Aviation Act suggests that Congress intended that the Act have no general preemptive effect. We agree.
 
 
 9
 Congress enacted the Federal Aviation Act of 1958, Pub.L. No. 85-726, 72 Stat. 731, "to establish a new Federal agency with powers adequate to enable it to provide for the safe and efficient use of the navigable airspace by both civil and military operations." H.R.Rep. No. 2360, 85th Cong., 2d Sess. 1, reprinted in 1958 U.S.C.C.A.N. 3741, 3741. The Act directed the Federal Aviation Agency to regulate "air commerce in such manner as to best promote its development and safety and fulfill the requirements of national defense." Pub.L. No. 85-726, § 103, 72 Stat. 740 (1958) (codified at 49 U.S.C.App. § 1303 (1988)). Although the legislative history states the Act provides the Federal Aviation Agency with "full responsibility and authority" over safety, H.R.Rep. No. 2360, reprinted in 1958 U.S.C.C.A.N. at 3741, the Act also assigned the Civil Aeronautics Board responsibility for safety,[5] "emphasized ... that air carriers themselves retained certain responsibilities,"[6] and did not address what, if any, responsibility remained for the states.
 
 
 10
 The Act contains a savings clause that states:
 
 
 11
 Nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies.
 
 
 12
 49 U.S.C.App. § 1506. As other courts have held, this section shows that Congress did not intend to occupy the field of airplane safety to the exclusion of the state common law.[7] See In re Air Crash Disaster, 635 F.2d 67, 74-75 (2d Cir.1980); In re Mexico City Aircrash, 708 F.2d 400, 407 (9th Cir.1983) (dictum); Sunbird Air Servs., Inc. v. Beech Aircraft Corp., 789 F.Supp. 360, 362 (D.Kan.1992); Holliday v. Bell Helicopters Textron, Inc., 747 F.Supp. 1396, 1398-99 (D.Haw.1990); In re Air Crash Disaster, 721 F.Supp. 1185, 1187 (D.Colo.1988); Brunwasser v. Trans World Airlines, Inc., 541 F.Supp. 1338, 1345-46 (W.D.Pa.1982); Alaska Airlines, Inc. v. Sweat, 568 P.2d 916, 927 (Ala.1977); Elsworth v. Beech Aircraft Corp., 37 Cal.3d 540, 208 Cal.Rptr. 874, 691 P.2d 630, 635 (1984), cert. denied, 471 U.S. 1110, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985); see also Perry v. Mercedes Benz of N. Am., Inc., 957 F.2d 1257, 1264 (5th Cir.1992) (the National Traffic and Motor Vehicle Safety Act of 1966's savings clause shows Congress's intent not to occupy the field). We arrived at the same conclusion in dicta in McCord v. Dixie Aviation Corp., 450 F.2d 1129, 1131 (10th Cir.1971).[8] By its very words, the statute leaves in place remedies then existing at common law or by statute. Tort liability for design defects was established in the law of many states by the late 1950s and had been extended to airplane crash cases. See, e.g., DeVito v. United Air Lines, 98 F.Supp. 88, 96-97 (E.D.N.Y.1951) (failure to warn); Dix W. Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 816, 821 (1962); see also Restatement of Torts § 398 (1938) (establishing liability for "chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured"). There is nothing inconsistent with Congress's goal of maximum safety and common law claims.
 
 
 13
 Last term, the Supreme Court analyzed the Act's savings clause in the context of a challenge to state laws prohibiting deceptive advertising of air fares. In Morales v. Trans World Airlines, Inc., --- U.S. ----, ----, 112 S.Ct. 2031, 2034, 119 L.Ed.2d 157 (1992), the Court stated the presence of the savings clause and, prior to 1978, the absence of an express preemption clause,[9] resulted in the states retaining their traditional regulatory powers in this area.[10] Since Congress has not enacted an express preemption clause governing airplane safety, Morales supports our conclusion that the savings clause demonstrates the Federal Aviation Act does not preempt state common law.[11]
 
 
 14
 A tool of statutory interpretation, expressio unius est exclusio alterius, also bolsters this conclusion. In Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992), the Court used this doctrine to hold that implied preemption is generally inapplicable to a federal statute that contains an express preemption provision. The Court stated that "enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not preempted."[12] Id.
 
 
 15
 In the present case, Piper asserts that Cleveland's claims are impliedly preempted by the Federal Aviation Act of 1958, 49 U.S.C.App. §§ 1301 et seq., and corresponding federal regulations. Piper does not maintain that Cleveland's claims are expressly preempted.[13] The Act, however, governs two broad areas of congressional concern and contains an express preemption provision governing one of them--rates and routes. 49 U.S.C.App. § 1305(a). Under Cipollone, this implies that the other broad area of congressional concern--air safety--is not preempted because it is "beyond [the] reach" of the express preemption provision. Cipollone, --- U.S. at ----, 112 S.Ct. at 2618.[14] Although § 1305(a) was not part of the original Act,[15] its inclusion in 1978[16] shows that Congress, like the states and the Civil Aeronautics Board, which at that time enforced portions of the statute, believed the Act lacked general preemptive reach.[17]
 
 
 16
 The United States, which has filed an amicus brief urging preemption, points us to 49 U.S.C.App. § 1508(a), which it suggests evinces Congress's intent to occupy the field of air safety. That section of the original Act, see Pub.L. No. 85-726, 72 Stat. 798, states that the United States has "complete and exclusive national sovereignty in the air space above the United States." The Government suggests that in this section Congress "made clear" that "air commerce is an exclusively federal function." However, § 1508(a) addresses the Congress's intent to keep the United States free from military planes from foreign nations, and not domestic safety concerns. Thus, it is inapplicable.
 
 
 17
 We conclude that Congress has not indicated a "clear and manifest" intent to occupy the field of airplane safety to the exclusion of state common law. To the contrary, it appears through the savings clause that Congress has intended to allow state common law to stand side by side with the system of federal regulations it has developed.
 
 
 18
 Piper also suggests that the Federal Aviation Act impliedly preempts state tort claims because the federal regulatory framework actually conflicts with state common law duties. Such a conflict will be found if it is "a physical impossibility" to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or when the state law is an obstacle to accomplishing Congress's full purposes and objectives, California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 581, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). In particular, Piper focuses on Cleveland's claims that the plane's design was defective because it leaves a rear-seat pilot with poor forward visibility and because the rear seats lack shoulder harnesses. We find that is not impossible to meet both state common law standards and the federal regulations.
 
 
 19
 Piper maintains that Cleveland's claims are an attack on the tailwheel design, which is approved by the FAA. See 14 C.F.R. pt. 25 app. A. However, the federal regulations Piper has cited require only that the plane be designed "so that ... [t]he pilot's view is sufficiently extensive, clear, and undistorted, for safe operation." 14 C.F.R. § 23.773(a)(1). The regulations do not require the precise design that Piper has utilized. As the district court noted, Cleveland has presented evidence that Piper could have improved visibility without altering the tailwheel design simply by raising the rear pilot seat. Thus, there is no irreconcilable conflict.
 
 
 20
 Piper also asserts that it fully complied with the seat belt requirements because the regulations in place when the FAA approved its design of the plane did not require shoulder harnesses. It asserts that the FAA did not make later requirements retroactive. This, however, is not an argument for preemption since it would have been possible to install a shoulder harness on the rear pilot's seat without conflicting with the federal regulations.
 
 
 21
 Furthermore, as noted previously, the Federal Aviation Act authorizes promulgation of "minimum standards." 49 U.S.C.App. § 1421. By themselves, minimum standards such as these are not conclusive of Congress's preemptive intent. Ray v. Atlantic Richfield Co., 435 U.S. 151, 168 n. 19, 98 S.Ct. 988, 1000 n. 19, 55 L.Ed.2d 179 (1978). However, minimum standards may be evidence of such intent. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 147-48, 83 S.Ct. 1210, 1219-20, 10 L.Ed.2d 248 (1963). The district court determined that by designating the standards as minimum, Congress indicated that it did not want to bar states from adopting additional or more stringent standards. See also Holliday v. Bell Helicopters Textron, Inc., 747 F.Supp. 1396, 1400-01 (D.Haw.1990); Perry v. Mercedes Benz of North America, Inc., 957 F.2d 1257, 1264-65 (5th Cir.1992) ("minimum standard" requirement for automobiles). This is consistent with the Act's purpose of promoting safety. 49 U.S.C.App. §§ 1302, 1303; H.R.Rep. No. 2360, 85th Cong., 2d Sess. 1, reprinted in 1958 U.S.C.C.A.N. 3741, 3741. The United States, however, suggests an alternative interpretation. It urges that rather than giving states the option to heighten standards, the "minimum standards" limitation allows manufacturers to improve safety beyond that which the federal government requires. This, too, would be consistent with the Act's purposes. While we are skeptical that Congress was concerned that administrative agencies and manufacturers would otherwise feel constrained to improve the safety of products, we need not resolve this ambiguity. In determining congressional intent on preemption questions, we look for "clear and manifest" indicators. English v. General Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). We find none here.
 
 
 22
 Piper also suggests that Cleveland's claims are preempted because the FAA and its predecessor agencies approved the airplane's design. However, FAA approval is not intended to be the last word on safety. The FAA has given manufacturers broad responsibilities for assuring their own compliance by appointing aircraft company employees to "act as surrogates of the FAA in examining, inspecting, and testing aircraft for purposes of certification." United States v. Varig Airlines, 467 U.S. 797, 807, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). The Varig Court said:
 
 
 23
 The FAA certification process is founded upon a relatively simple notion: the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains the responsibility for policing compliance. Thus, the manufacturer is required to develop the plans and specifications and perform the inspections and tests necessary to establish that an aircraft design comports with the applicable regulations; the FAA then reviews the data for conformity purposes by conducting a "spot check" of the manufacturer's work.
 
 
 24
 Id. at 816-17, 104 S.Ct. at 2766 (footnote omitted). Thus, FAA certification is, by its very nature, a minimum check on safety.
 
 
 25
 Piper also asserts that we should be guided by a line of cases holding that the National Traffic and Motor Vehicle Safety Act (NTMVSA), 15 U.S.C. §§ 1381 et seq., and corresponding regulations, preempt state tort claims for failure to install air bags. The regulations give automobile manufacturers a choice of equipping cars with any of three types of passenger restraints, including air bags. 49 C.F.R. § 571.208 (Safety Standard 208).[18] See Kitts v. General Motors Corp., 875 F.2d 787 (10th Cir.1989), cert. denied, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); Pokorny v. Ford Motor Co., 902 F.2d 1116 (3d Cir.), cert. denied, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); Taylor v. General Motors Corp., 875 F.2d 816 (11th Cir.1989), cert. denied, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988), cert. denied, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990). But see Perry v. Mercedes Benz of N. Am., Inc., 957 F.2d 1257 (5th Cir.1992) (no preemption for installation of defective air bags). These cases determine that "a state common law rule that would, in effect, remove the element of choice authorized in Safety Standard 208 would frustrate the federal regulatory scheme." Taylor, 875 F.2d at 827. Thus, they hold that "[a]llowing a common law action holding manufacturers liable for failing to install air bags in motor vehicles would be tantamount to establishing a conflicting safety standard that necessarily encroaches upon the goal of uniformity specifically set forth by Congress in this area." Kitts, 875 F.2d at 789 (quoting Wood, 865 F.2d at 402).
 
 
 26
 The regulations at issue here are different than those in the air bag cases. As noted previously, the requirements cited by Piper do not specify how a manufacturer must ensure visibility. 14 C.F.R. § 23.773(a)(1). Further, as Piper states, there were no requirements in place on rear seat shoulder harnesses when the FAA certified its approval of the Piper Super Cub.[19] Thus, the air bag cases Piper relies on are not applicable to the claims asserted here.
 
 
 27
 In addition, while there are, without question, similarities between the NTMVSA and the Federal Aviation Act, there are also key differences. Like the Act in question here, the NTMVSA contains a savings clause preserving state tort remedies. 15 U.S.C. § 1397(k). Similarly, the NTMVSA authorizes the regulatory agency to issue only minimum standards. Id. § 1391(2). However, unlike the Federal Aviation Act, the NTMVSA contains an express preemption provision governing safety. This provision forbids any state-established "safety standard ... which is not identical to the Federal standard." 15 U.S.C. § 1392(d). Thus, in the automobile air bag cases, the courts were faced with the task of deciphering congressional intent when the lawmakers have expressly preempted state regulation but not common law liability. See, e.g., Wood, 865 F.2d at 401. In this case, however, the Federal Aviation Act contains no express preemption provision governing safety. See Holliday v. Bell Helicopters Textron, Inc., 747 F.Supp. 1396, 1400 & nn. 2-3 (D.Haw.1990) (distinguishing the Federal Aviation Act and the National Traffic and Motor Vehicle Safety Act).
 
 
 28
 Furthermore, when the Court recently applied the doctrine of expressio unius est exclusio alterius to preemption cases, it excluded consideration of all forms of implied preemption, including conflict preemption. Cipollone, --- U.S. at ----, 112 S.Ct. at 2618. Justice Blackmun's concurring opinion made this explicit. Id. at ----, 112 S.Ct. at 2625 ("We resort to principles of implied pre-emption--that is, inquiring whether Congress has occupied a particular field with the intent to supplant state law or whether state law actually conflicts with federal law--only when Congress has been silent with respect to pre-emption.") (citation omitted, emphasis added); see also id. at ----, 112 S.Ct. at 2633 (Scalia, J., dissenting) (asserting that this aspect of the decision "works mischief"). Congress's inclusion of § 1305(a) preempting state regulation of air rates and routes suggests that it intended the Federal Aviation Act not to preempt common law claims such as those set forth in this suit.[20] See Holliday, 747 F.Supp. at 1400 n. 3 (pre-Cipollone analysis).
 
 
 29
 Thus, we agree with the district court that Cleveland's claims are not preempted by federal law.[21]
 
 III. LIMITATIONS ON THE NEW TRIAL
 A. DAMAGES
 
 30
 The district court made two rulings limiting the scope of the second trial which the defendant attacks as beyond the mandate of this court's initial opinion. The judge stayed both rulings to give this court an opportunity to review them under 28 U.S.C. § 1292(b).[22]
 
 
 31
 The first disputed ruling concerns the district court's decision to accept the original jury's verdict on the amount of damages, foregoing retrial of this issue. Rather, the new trial would concern only questions of liability and apportionment of negligence. Piper argues that this ruling is contrary to this court's previous mandate. In our earlier opinion, we observed that in the new trial:
 
 
 32
 [T]he special verdict form should permit the jury to determine which of the parties and non-parties (whether "original tortfeasors" or "crashworthiness tortfeasors") were negligent; whether the negligence of each of such parties and non-parties was a proximate cause of Plaintiff's injury and damages; the amount of damages sustained by the Plaintiff; and to compare the negligence of each party and non-party (whether "original tortfeasors" or "crashworthiness tortfeasors") found to be the proximate cause of the Plaintiff's injuries and damages.
 
 
 33
 Cleveland, 890 F.2d at 1557 (emphasis added).
 
 
 34
 The district court interpreted the phrase "the amount of damages sustained by the Plaintiff" to be limited to the apportionment of damages, since this was the central focus of our discussion about the deficiency of the special verdict form. Piper now urges that this interpretation is contrary to our mandate. The plaintiff on the other hand urges that no issues of damages remain, and that it is more logical and efficient to limit the second trial to apportionment questions since the amount of damages has been adjudicated in the first trial.
 
 
 35
 In our earlier opinion we granted a new trial as to both liability and damages. Our original opinion contemplated a recomputation of the damage amount as well as the apportionment of the award.
 
 
 36
 This court found the deficiency of the special verdict to be as follows:
 
 
 37
 [T]he trial court should have permitted the jury to determine whether the negligence of original tortfeasors was a proximate cause of Plaintiff's enhanced injuries, and to compare the negligence of any original tortfeasors found to be a proximate cause of the enhanced injuries to the negligence of any crashworthiness tortfeasors and of the Plaintiff which was found to have proximately caused Plaintiff's enhanced injuries. The special verdict form was erroneous and contrary to New Mexico law because it did not permit the jury to do so. As we have already indicated, our remand of this case to the district court for a new trial is necessary on this basis.
 
 
 38
 Cleveland, 890 F.2d at 1556.
 
 
 39
 The district court's interpretation overlooks this court's earlier observation that a second jury may in fact find that the plaintiff's injuries are partially or wholly attributable to the original collision. Cleveland, 890 F.2d at 1550. In our earlier opinion, we discussed that under New Mexico law, the crashworthiness tortfeasors could not be concurrent tortfeasors with the original collision tortfeasors as to injuries received in the original collision,[23] but both groups of tortfeasors could be concurrent tortfeasors as to the second (or crashworthiness) collision. Id. at 1549-50. Thus, this court concluded that the special verdict form did not allow for an apportionment of fault of the original tortfeasors as required by New Mexico law.
 
 
 40
 Having explained the above described deficiency, our earlier opinion recognized that although the original verdict found that the crashworthiness negligence (lack of the shoulder harness) caused 100% of Cleveland's injuries, a different finding might be made in the second trial. If this occurred, the damages would have to be apportioned between those injuries resulting solely from the original collision and those incurred by reason of the lack of the shoulder harness. This apportionment cannot be determined solely by percentages since the crashworthiness tortfeasors could not have caused any of the injuries from the original collision. This follows because the latter are not deemed concurrent tortfeasors in the original collision under New Mexico law.
 
 
 41
 Thus, we hold that the trial court erred in finding that a new trial was not required as to the overall amount of damages.
 
 B. WITNESSES
 
 42
 The second disputed ruling concerns the district court's order that the new trial be limited to the same witnesses and exhibits as produced in the original trial. Piper urges this ruling is error and not contemplated by our prior opinion.
 
 
 43
 The district court has broad discretion in its control and management of trials. This discretion extends on remand to all areas not covered by the higher court's mandate. See Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 168, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939); United States v. Iriarte, 166 F.2d 800, 803 (1st Cir.), cert. denied, 335 U.S. 816, 69 S.Ct. 36, 93 L.Ed. 371 (1948). The Federal Rules of Civil Procedure require that all actions be disposed of in a fair and expeditious manner. See Fed.R.Civ.P. 1. Trial judges exercise broad discretion in limiting issues to be tried, evidence to be used (such as by avoiding cumulative and collateral proof), the time for oral argument, and the number of witnesses and experts who can be produced. Pretrial procedures are designed to manage trials, schedule and make expeditious discovery procedures, formulate issues, and provide fair notice of witnesses and proof to be adduced by all parties to litigation.
 
 
 44
 Notwithstanding the recognition of the trial court's broad discretionary authority over such issues, its rulings nevertheless must be balanced with constitutional fairness so as not to prejudice the basic rights of the parties.
 
 
 45
 In the present case, Piper wishes to produce new witnesses (all but one of whom is an expert witness), exhibits, and regulations at the new trial.[24] The district court denied use of all new witnesses and evidence. It found that this limitation was in harmony with the court's earlier opinion. However, the trial court also found such a limitation did not mean that the second trial will necessarily duplicate the first.
 
 
 46
 We note that the accident occurred on July 8, 1983. The original pretrial order was filed on February 10, 1986. The parties had ample time for discovery and investigation. Our remand for a new trial was not an invitation to reopen discovery for newly retained expert witnesses and to enlarge trial time unnecessarily through the addition of totally new exhibits and testimony. It is always easy in hindsight for counsel to realize there may be a better way to try a case the second time around. Hindsight advantage necessarily inures to both sides, but this does not mean a court, when faced with procedural error, must allow either side to introduce totally new expert witnesses to bolster or impeach earlier evidence.
 
 
 47
 Piper can further develop many of its theories and defenses through its earlier trial witnesses. The trial court undoubtedly resolved that much of Piper's new evidence would be cumulative and redundant of that which was produced before. It appears to this court that much of the proffered evidence constitutes a lawyer's theory of how to "plug the holes" of a case. Allowing Piper to use the newly discovered evidence would require extensive additional discovery. This court must defer to the trial court's balancing of the value of additional evidence with the need for judicial economy and the reasons that the case was remanded in the first place. As the Fifth Circuit has noted in a different context, pretrial procedures can achieve the purpose
 
 
 48
 of improving the quality of justice only if the pretrial requirements entered at the discretion of the trial court are applied with intelligent flexibility, taking into full consideration the exigencies of each situation. The trial judge must be permitted wide latitude in guiding a case through its preparatory stages. His decision as to the extent that pretrial activity should prevent the introduction of otherwise competent and relevant testimony at trial must not be disturbed unless it is demonstrated that he has clearly abused the broad discretion vested in him by Rule 16.
 
 
 49
 Davis v. Duplantis, 448 F.2d 918, 921 (5th Cir.1971).
 
 
 50
 We find the same principles should govern the trial court's discretion in managing a second new trial in any given case. The trial court is much more familiar with the conduct of the original trial, the needs for judicial management and the requirements of basic fairness to the parties in a new trial. We do not feel, however, that the trial court's ruling should be inflexible. Clearly, if the trial court perceives in limiting evidentiary proof in a new trial, a manifest injustice, to one side or the other,[25] the court must retain broad latitude and may with proper notice allow additional witnesses and relevant proof. In this regard, if a party makes a timely motion to produce new and material evidence which was not otherwise readily accessible or known, the court should, within the exercise of discretion, consider whether denial of the new evidence would create a manifest injustice. If a lay or expert witness is deceased or ill or for whatever reason unable to attend trial, the court should give every consideration to allowing additional witnesses to testify. This does not mean the court should allow cumulative evidence, but it does mean that the court should allow sufficient leeway for the parties to produce new evidence, without undue prejudice to their interest. Technical rulings should never preclude new and material proofs; common sense should control. In conclusion, we remand to the trial court the issue concerning Piper's motion to adduce new witnesses and new evidence; the court in accord with the principles set forth here may in the exercise of discretion, reaffirm or modify its original ruling.
 
 
 51
 In conclusion, we affirm the denial of Piper's motion for summary judgment on the grounds of federal preemption. We remand for reconsideration the trial court's denial of the use of all new expert witnesses and exhibits with the understanding that parties may move for the admission of new evidence and use of new witnesses upon a showing of manifest injustice in the denial of their use. We reverse the court's order that limits the verdict only to liability issues.[26]
 
 
 
 [1]
 Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [2]
 After considering the jury's findings on Piper's culpability, the trial judge reduced the award to $1,042,500 plus post-judgment interest and costs
 
 
 [3]
 See 49 U.S.C.App. §§ 1301 et seq. (1988)
 
 
 [4]
 As we noted previously, evidence at trial showed Piper "permitted the plane to be flown from the rear seat and provided a large trapezoidal window for photography." Cleveland, 890 F.2d at 1554
 
 
 [5]
 Pub.L. No. 85-726, § 102, 72 Stat. 740 (1958) (current version at 49 U.S.C.App. § 1302 (1988)); H.R.Rep. No. 2360, reprinted in 1958 U.S.C.C.A.N. at 3747-48
 
 
 [6]
 United States v. Varig Airlines, 467 U.S. 797, 804, 104 S.Ct. 2755, 2760, 81 L.Ed.2d 660 (1984)
 
 
 [7]
 Piper has cited several cases finding that Congress intended to occupy the field of pilot safety, thereby precluding enforcement of state laws pertaining to regulation of employee drug use. See French v. Pan Am Express, Inc., 869 F.2d 1 (1st Cir.1989) (drug testing); Northwest Airlines, Inc. v. Gomez-Bethke, 34 Fair Empl.Prac.Cas. (BNA) 837, 1984 WL 1040 (D.Minn. Apr. 1, 1984) (employment rights of chemically dependent workers). Although these cases suggest Congress intended uniformity of regulation, they are not persuasive because they address pilot regulation and because they do not involve tort claims that implicate the savings clause of 49 U.S.C.App. § 1506, which shows contrary congressional intent. Similarly, the Supreme Court's decision in City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), did not involve allegations of defective design of an airplane. It involved a municipality's efforts to regulate airplane noise, which the Court found "remains peculiarly within the competence of FAA, supplemented now by the input of EPA." Id. at 640, 93 S.Ct. at 1863
 
 
 [8]
 We held in McCord that Congress did not intend to create a separate private cause of action contrary to common law by enactment of the Act. 450 F.2d at 1131. We noted, however, that "[t]he Act particularly provides that nothing therein shall in any way abridge or alter the remedies now existing at common law." Id. The opinion also observes Congress's power to "preempt state law with respect to liabilities for torts arising out of the operation of airplanes." Id
 
 
 [9]
 The Morales Court held that the preemption provisions of 49 U.S.C.App. § 1305, enacted in 1978 to address rates and routes, expressly preempt the state truth-in-advertising laws. --- U.S. at ---- - ----, 112 S.Ct. at 2040-41
 
 
 [10]
 But cf. City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 635-40, 93 S.Ct. 1854, 1860-63, 36 L.Ed.2d 547 (1973) (the "pervasive nature of the scheme of federal regulation of aircraft noise" indicates intent to preempt)
 
 
 [11]
 We will restrict the effect of a savings clause such as the one here in limited circumstances. For example, in Morales, the Court stated a savings clause should be limited if it is superseded by a more specific substantive provision, such as a preemption clause. --- U.S. at ----, 112 S.Ct. at 2037. This Act contains an express preemption provision that "relates to rates, routes or services of any carrier," 49 U.S.C.App. § 1305, and not to tort claims such as these
 In other situations the Court has limited a savings clause if it presents "an irreconcilable conflict between the statutory scheme and the persistence of common-law remedies," Nader v. Allegheny Airlines, 426 U.S. 290, 299-300, 96 S.Ct. 1978, 1984-1985, 48 L.Ed.2d 643 (1976) (holding no irreconcilable conflict), or if it would "undermine [a] carefully drawn statute," International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987). Common law remedies do not interfere with the Act's goal of promoting safety. See 49 U.S.C.App. §§ 1302, 1303 (1988); H.R.Rep. No. 2360, 85th Cong., 2d Sess. 1, reprinted in 1958 U.S.C.C.A.N. 3741, 3741. The Act further suggests a lack of conflict because it empowers the Secretary of Transportation to establish "[s]uch minimum standards governing the design ... of aircraft ... as may be required in the interest of safety." 49 U.S.C.App. § 1421(a)(1).
 
 
 [12]
 The Court stated:
 When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," Malone v. White Motor Corp., 435 U.S. at 505, 98 S.Ct. [1185] at 1190 [55 L.Ed.2d 443 (1978) ] "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. California Federal Savings & Loan Assn. v. Guerra, 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.). Such reasoning is a variant of the familiar principle of expressio unius est exclusio alterius: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not preempted.
 Cipollone, --- U.S. at ----, 112 S.Ct. at 2618.
 
 
 [13]
 In Morales v. Trans World Airlines, --- U.S. ----, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Supreme Court gave a broad reading to the preemptive provision in 42 U.S.C.App. § 1305(a). The Court held that the section's prohibition of state enforcement of any law "relating to rates, routes, or services of any air carrier" preempts state regulation of airline advertising. Id. at ---- - ----, 112 S.Ct. at 2040-41. We agree with the parties in this case that even a broad reading of the phrase, "relates to," would not encompass the safety regulations at issue here
 
 
 [14]
 But see French v. Pan Am Express, Inc., 869 F.2d 1, 3 (1st Cir.1989) (rejecting this argument pre-Cipollone ). The court in French mistakenly relies on City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), which it states implicitly rejected this argument when it found the Act impliedly preempts application of municipal noise ordinances to air flights. However, the City of Burbank opinion is inapplicable because § 1305's preemptive provision was enacted into law five years after the City of Burbank decision. See Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705
 
 
 [15]
 See Pub.L. No. 85-726, 72 Stat. 731
 
 
 [16]
 See Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705; see also Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98-443, 98 Stat. 1703 (making a minor amendment to the preemption provision of 49 U.S.C.App. § 1305(a))
 
 
 [17]
 The House Report concerning the Airline Deregulation Act of 1978 states its express preemption language "will prevent conflicts and inconsistent regulations" caused by the lack of a specific provision allocating state and federal jurisdiction over air service. H.R.Rep. No. 95-1211, 95th Cong., 2d Sess. 16 (1978), reprinted in 1978 U.S.C.C.A.N. 3737, 3752. The Report observed that without such a provision federal and state authorities had required passengers traveling between two cities to pay different fares depending on whether they were flying interstate or intrastate. Id., reprinted in 1978 U.S.C.C.A.N. at 2751-52
 It is significant that in passing the 1978 Act, Congress also considered safety concerns. Congress asked the Civil Aeronautics Board to prevent "deterioration in established safety procedures," Pub.L. No. 95-504, § 102, 92 Stat. 1706, directed the Secretary of the Transportation to prepare annual reports on air safety because of Congress's concern that the Act "result in no diminution of the high standard of safety in air transportation attained in the United States," id. § 107(a), 92 Stat. 1709, and required the Secretary of Transportation to promulgate new safety regulations as needed, id. § 107(d), 92 Stat. 1710. Not only are none of these requirements inconsistent with state common law duties, but juxtaposed against the simultaneous enactment of express preemption of rates and routes, they show that Congress did not intend to preempt lawsuits over design defects.
 
 
 [18]
 Piper points us to a district court decision dismissing a claim against an airplane manufacturer. The dismissal was based on implied preemption grounds and cites Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988), cert. denied, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990). Dee v. Lake Aircraft, Inc., No. 88-0290-CIV-Kettoe (S.D.Fla. March 12, 1991). The Dee court does not provide its reasoning nor explain the issues in the case. Thus, we cannot determine if the decision should provide us any guidance. An appeal of the decision is now pending in the Eleventh Circuit Court of Appeals
 
 
 [19]
 A closer question is presented by regulations promulgated in 1969 to require manufacturers to choose one of three safety options, one of which utilized shoulder harnesses. See 14 C.F.R. § 23.785(g) (1970). Cleveland argues that Piper did not comply with any of the three options. However, as Piper states, these regulations apply only to planes receiving "type certificates" from the FAA beginning on September 14, 1969. 34 Fed.Reg. 13078, 13086 (1969). Since Piper received authority to build the Piper Cub years earlier, the 1969 amendments are irrelevant to our analysis. The fact that the FAA decided against making later amendments retroactive does not bring this case within the teachings of the air bag decisions. Piper's reasoning would suggest that anytime the government chooses not to regulate a field and leaves safety requirements to manufacturers, state court review of a manufacturer's choices would be preempted. Such reasoning stretches preemption doctrine beyond its bounds
 
 
 [20]
 As Justice Scalia's dissent points out, a blanket proscription creates difficulties for cases in which state and federal law actually conflict, making it impossible to satisfy both standards. Cipollone, --- U.S. at ----, 112 S.Ct. at 2633. In earlier cases, when the Court determined that it was impossible to meet both the state and federal regulations, it turned to the Supremacy Clause to determine that the federal regulations impliedly preempt the state regulations. See, e.g., M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Abandoning this position seems incongruous to say the least. We need not resolve this incongruity here, however, because there is no actual conflict between the regulations and state tort remedies. Other circuits, however, have determined "whenever Congress includes an express preemption clause in a statute, judges ought to limit themselves to the preemptive reach of that provision with essaying further analysis under the various theories of implied preemption." Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 823 (1st Cir.1992) (emphasis added), cert. denied, --- U.S. ----, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993); see also American Agric. Movement v. Board of Trade, 977 F.2d 1147, 1154 (7th Cir.1992) ("Only if a statute is devoid of explicit preemptive language may we resort to either variant of implied preemption.")
 
 
 [21]
 Piper also moved for summary judgment on the basis that Cleveland's claims should be dismissed because New Mexico has legislatively adopted certain federal aviation rules. See N.M.Stat.Ann. § 64-1-2 (1978 Comp.). The district court denied summary judgment and we agree. Not only does this statute not address tort claims, but to the extent the federal law allows tort claims to proceed, so too does the state law
 
 
 [22]
 The plaintiff claims that this court does not have jurisdiction over this part of the appeal because application to take an interlocutory appeal was not made within the required ten-days provided in 28 U.S.C. § 1292. We have considered this argument and find it without merit
 
 
 [23]
 As our earlier opinion explained, even though the original tortfeasors may be concurrent tortfeasors in contributing to the enhanced injuries, under New Mexico law comparative negligence law, the fault or negligence of all concurrent tortfeasors must be apportioned. See Cleveland, 890 F.2d at 1550 (citing Bartlett v. New Mexico Welding Supply, Inc., 98 N.M. 152, 646 P.2d 579, 585 (Ct.App.), cert. denied, 98 N.M. 336, 648 P.2d 794 (1982))
 
 
 [24]
 Piper wishes to produce the following witnesses: (1) Herbert M. Tooney, the former chief of the Aircraft Engineering Division of the Civil Aeronautics Administration (CAA) for the Eastern Region, to explain certain correspondence of the CAA to Piper which was received in evidence at the first trial; (2) Richard Chandler, the former manager of the Protection and Survival Laboratory of the FAA's Civil Aeromedical Institute, to discuss the development process of the shoulder harness; (3) Les Hudson, to testify about the purpose of the acquisition of the Super Cub involved in the accident; (4) Samuel Hayden, the former head of the Aircraft Modification Section of the FAA for the Eastern Region, to testify Cleveland violated federal aviation regulations by altering the airplane; (5) Bret Willat, who owns and operates a sailplane operation which utilizes a Super Cub, to testify about tow operations and to show a video he produced; and (6) J.T. Hayes, a New Mexico State police officer, to describe his investigation of the accident. Piper also wishes to introduce additional evidence depicting "the long and safe history of the thousands of Super Cubs ... with the same basic design and visibility characteristics."
 
 
 [25]
 See Fed.R.Civ.P. 16
 
 
 [26]
 The plaintiff has cross appealed the trial court's refusal to grant summary judgment on the issue of liability. Such a ruling would contradict this court's earlier opinion. In addition, it is not among the issues properly certified by the trial court under 28 U.S.C. § 1292(b)