**FOURTH DIVISION
DOYLE, P. J.,
ANDREWS, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**March 28, 2013**

# In the Court of Appeals of Georgia

A12A1822. SYNOVUS BANK, d/b/a BANK OF NORTH GEORGIA, et al. v. GRINER, et al.

BRANCH, Judge.

The plaintiffs in this case, account holders at state-chartered, federally-insured banks, filed this action against the banks asserting that the overdraft fees the banks charged in connection with debit card transactions and ATM withdrawals violated Georgia's usury laws. This appeal presents the question of whether the plaintiffs have pled sufficient facts to allow them to proceed to discovery on their claims, or whether the trial court erred in denying the banks' motion to dismiss the complaint for failure to state a claim on which relief can be granted. For the reasons set forth below, we find that the plaintiffs' pleadings are sufficient to allow them to proceed to discovery, and we therefore affirm the order of the trial court denying the motion to dismiss.

The standard for dismissal of a complaint under OCGA § 9–11–12 (b) (6) for failure to state a claim is settled and familiar. A complaint should be dismissed for failure to state a claim only if its allegations, when viewed in the light most favorable to the plaintiff, "disclose with certainty that no set of facts consistent with the allegations could be proved that would entitle the plaintiff to the relief he seeks." (Citation and punctuation omitted). *Benedict v. State Farm Bank, FSB*, 309 Ga. App. 133, 134 (1) (709 SE2d 314) (2011). "Put another way, 'if, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient.'" (Citation and punctuation omitted). Id. "Like the court below, when we assess the sufficiency of the complaint on appeal, we must accept the allegations of fact that appear in the complaint and view those allegations in the light most favorable to the plaintiff." (Citation omitted.) *Bush v. Bank of N.Y. Mellon*, 313 Ga. App. 84, 89 (720 SE2d 370) (2011). And on appeal, we owe no deference to the decision of the court below, but instead decide for ourselves whether the complaint states a claim upon which relief might properly be granted. *Benedict*, 309 Ga. App. at 134 (1).

Viewed in the light most favorable to the plaintiffs, the record shows that Thomas Griner and Fern Cohn[1] filed this action in the State Court of Gwinnett County against Synovus Bank and a number of its subsidiaries (collectively "Synovus"), all of whom are state-chartered, federally-insured banks. According to the complaint, Synovus issues bank cards to its customers, which can be used to withdraw cash at ATMs and to debit the customer's account as part of a sales transaction.[2] When a Synovus customer uses his or her bank card, and the customer's available account balance is insufficient to cover the transaction, Synovus's automated systems either automatically approve or automatically reject the transaction. If the transaction is approved, Synovus advances its money to the customer as an "Overdraft," and it charges the customer an "Overdraft Fee." Synovus also charges an "Overdraft Collection Fee" if a customer's account remains in overdraft for seven days. As soon as a customer deposits any new money into his or her account, Synovus automatically debits the account in the amount needed to collect the full outstanding and unpaid

---

[1] Griner and Cohn filed suit on "behalf of themselves and all persons similarly situated." At the time of this appeal, however, there had been no motion seeking certification of a class.

[2] The debit feature of the card allows the customer to make purchases using the funds in his account without having to write a check.

3

amount of the Overdraft, the Overdraft Fee, and the Overdraft Collection Fee. . The plaintiffs allege that the effective rate of interest charged by Synovus through its Overdraft and Overdraft Collection Fees grossly exceeds the interest limit rates imposed by the State's usury laws, with the interest rate at times exceeding 1,000,000%. The complaint asserts claims for civil usury, criminal usury, conversion, and money had and received.

After suit was filed, Synovus removed the case to federal court, asserting that the plaintiffs' claims were preempted by federal law. The federal district court, however, granted Griner and Cohn's motion to remand the case to state court, finding that federal law did not completely preempt the question of whether the fees at issue were interest, and therefore whether the plaintiffs could bring state law claims based on those fees. *Griner v. Synovus Bank*, 818 F.Supp.2d 1338, 1347 (III) (B) (1) (b) (N. D. Ga., 2011).

Upon remand, Synovus moved to dismiss the complaint under OCGA § 9-11-12 (b) (6), for failure to state a claim upon which relief could be granted. The trial court denied that motion, but certified its order for immediate review. Synovus then filed an application for a discretionary appeal, which we granted. This appeal followed.

4

Synovus argues that the trial court erred in denying its motion to dismiss because: (1) the plaintiffs' state law claims are barred under the doctrine of implied preemption; (2) the fees at issue do not constitute interest under federal law; (3) the fees do not constitute interest under Georgia law; and (4) if the fees are considered interest under Georgia law, the claims are barred by the Georgia Credit Card and Credit Card Bank Act. OCGA § 7-5-1, et seq. As explained more fully below, we agree with the trial court's conclusion that the plaintiffs' claims are not preempted by federal law. We therefore find that the federal definition of interest is not relevant to the question of whether plaintiffs have stated a claim upon which relief can be granted. Additionally, we find that the question of whether the fees at issue constitute interest under Georgia law cannot be determined at the pleading stage. Finally, we agree with the trial court's conclusion that the Georgia Credit Card and Credit Card Bank Act is inapplicable to the current case. Accordingly, we affirm the order of the trial court denying Synovus's motion to dismiss.

1. Synovus argues that the plaintiffs' state law claims are barred because they are impliedly preempted by federal law, specifically the Depository Institutions Deregulation and Monetary Contract Act ("DIDA"), 12 USC §1831d. We disagree.

In analyzing Synovus's preemption claim, we first note that when determining whether a federal statute impliedly preempts state law,

> our interpretation of [the federal statute] does not occur in a contextual vacuum. Rather, that interpretation is informed by two presumptions about the nature of pre-emption. First, because the States are independent sovereigns in our federal system, . . . Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has "legislated in a field which the States have traditionally occupied," we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

(Citations omitted.) *Medtronic v. Lohr*, 518 U. S. 470, 485 (III) (116 SC 2240, 135 LE2d 700) (1996). And banking, particularly the regulation of state-chartered banks, is a field traditionally occupied by the States. As the United States Supreme Court has explained:

> both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern. . . . [S]ound financial institutions and honest financial practices are essential to the health of any State's economy and to the well-being of its people. Thus, it is not surprising that ever since the early days of our Republic, the States have chartered banks and have actively regulated their activities.

*Lewis v. BT Inv. Managers, Inc.*, 447 U. S. 27, 38 (III) (A) (100 SC 2009, 64 LE2d 702) (1980). See also *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1301 (IV) (C) (11th Cir. 2005), opinion vacated on other grounds, 446 F3d 1358 (11th Cir. 2006) ("while state banks are subject to some federal regulation, the *states* remain the 'primary regulatory authority' over state banks participating in the FDIC's deposit insurance program") (citation omitted; emphasis in original).

Bearing the foregoing in mind, we turn to the question of whether federal law impliedly preempts the claims asserted in the current lawsuit. Under the doctrine of implied or "conflict" preemption, "Congressional intent to impliedly preempt state law can be found when there is an 'actual conflict' between state and federal law." (Citation omitted.) *Parks v. Hyundai Motor America*, 294 Ga. App. 112, 113 (1) (668 SE2d 554) (2008). An "actual conflict" supporting implied preemption exists when the state law in question "prevent[s] or frustrate[s] the accomplishment of a federal objective" or "make[s] it 'impossible' for private parties to comply with both state and federal law." *Geier v. American Honda Motor Co.*, 529 U. S. 861, 873 (III) (120 SC 1913, 146 LEd2d 914) (2000).

Congress enacted DIDA in response to the "credit crunch" and resulting rise in interest rates that occurred in the late 1970's. See *Greenwood Trust Co. v.*

7

*Commonwealth of Mass.*, 971 F.2d 818, 826 (III) (C) (2) (1st Cir. 1992). State usury laws limited the interest rates that could be charged by state-chartered banks, with the result being that loans from such banks were economically unfeasible from a lender's point of view. Id. "National banks[, however,] did not share this inhibition because they could charge whatever interest rates were allowed under the National Bank Act," 12 USC § 85 ("NBA"). Id. Because "section 85 [of the NBA] authorized national banks to use interest rates set by reference to federal discount rates, state institutions were at an almost insuperable competitive disadvantage." (Footnote omitted.) Id. Thus, "to prevent discrimination against State-chartered [federally] insured depository institutions, including insured savings banks," Congress enacted DIDA, which addresses the interest rates that may be charged by state-chartered, federally-insured banks. 12 USCA §1831d (a).

Synovus argues that allowing the underlying lawsuit to proceed would frustrate the federal objective underlying DIDA, which it claims is to prevent "discrimination against state-chartered banks with respect to interest rates and usury." DIDA prescribes the maximum interest rate that such banks may charge, as well as the penalties for exceeding that rate. The relevant portion of DIDA provides:

(a) Interest rates

8

In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, *if* the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is *hereby preempted for the purposes of this section*, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, *whichever may be greater*.

(b) Interest overcharge; forfeiture; interest payment recovery

*If* the rate prescribed in subsection (a) of this section exceeds the rate such State bank or such insured branch of a foreign bank would be permitted to charge in the absence of this section, *and* such State fixed rate is thereby preempted by the rate described in subsection (a) of this section, the taking, receiving, reserving, or charging a greater rate of interest than is allowed by subsection (a) of this section, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the

person who paid it may recover in a civil action commenced in a court of appropriate jurisdiction not later than two years after the date of such payment, an amount equal to twice the amount of the interest paid from such State bank or such insured branch of a foreign bank taking, receiving, reserving, or charging such interest.

12 USCA § 1831d (emphasis supplied).

In its order remanding this case to state court, the federal district court found that "according to DIDA's plain language, it does not provide the exclusive cause of action for usury claims asserted against state-chartered banks, nor does it serve as the exclusive source of remedies governing such usury actions." (Citation omitted.) *Griner*, 818 FSupp2d at 1346 (III) (B) (1) (a). Rather, the court found that DIDA preempts state law only in limited circumstances – i.e., when state laws set a lower interest rate than that allowed by federal law. Where state law permits a higher interest rate than federal law, however, preemption is not triggered. Id. at 1349 (B) (1) (b). Specifically, the district court reasoned:

> it is clear that Congress, in enacting DIDA, provided a cohesive regulatory system that places national banks and state banks at parity by preserving state law under certain circumstances. In cases where a state's interest-rate limit is less than the federal rate allowable under § 1831d (a) or § 85 [of the NBA], DIDA serves to put state banks on equal footing with national banks: the national banks are authorized to charge the

10

federal interest rate under the NBA and may be penalized under the NBA for exceeding that rate, and the state banks are authorized to charge the federal interest rate under DIDA and may be penalized under DIDA for exceeding that rate. Likewise, when the interest rate available under state law is higher than the federal rate allowable under § 1831d(a) or § 85, the *national banks* are authorized to charge the state interest rate under the NBA and may be penalized under the NBA for exceeding that rate, and the *state banks* are authorized to charge the state interest rate under state law and may be penalized under state law for exceeding that rate. In other words, depending on the relationship between state-law and federal-law interest-rate limits, a state-chartered bank that charges excessive interest is subject to usury claims under either DIDA or state law, either one of which render the state-chartered bank's authority to charge interest equivalent to a national bank authority under the NBA. This statutory scheme is in harmony with the drafters' intent to end discrimination against state-chartered depository institutions.

(Emphasis in original.) Id. at 1349 (III) (B) (1) (b). See also *Thomas v. U. S. Bank Nat. Assn. ND*, 575 F3d 794, 799 (II) (A) (8th Cir. 2009) (finding that DIDA did not preempt claims against mortgage companies based on their alleged violations of state law regulating second mortgages).

On appeal, Synovus does not challenge the district court's rationale or its finding that DIDA does not completely preempt state law usury claims against state-chartered, federally insured banks. Rather, Synovus argues that DIDA impliedly

11

preempts the claims at issue, because to allow such claims would place state-chartered banks at a competitive disadvantage, thereby frustrating the congressional intent underlying DIDA, which was to "level the playing field" between state and national banks. In other words, as we understand it, Synovus's argument is that because national banks could charge unlimited overdraft fees in connection with debit card transactions and ATM withdrawals, while the fees state banks could charge would be limited by state usury law, national banks could make more money.[3]

Even assuming that Synovus's argument regarding being placed at a competitive disadvantage has some validity,[4] that assumption does not support a finding of implied preemption. There is no actual conflict between DIDA and state law, such that it would be impossible for state-chartered banks to comply with both with respect to the interest they could charge in connection with overdrafts resulting from debit card transactions or ATM withdrawals. The parties do not dispute that the

---

[3] As a matter of logic, we cannot think that Synovus is arguing that, if it were forced to lower its overdraft fees, it would somehow be at a competitive disadvantage in the consumer market.

[4] Whether Synovus actually would be at a competitive disadvantage cannot be determined at this stage of the litigation. In this regard, we note the possibility, demonstrated in the Appellees' brief, that such overdraft fees charged by national banks could, under some circumstances, be considered interest under federal law.

12

federal usury rate is less than the rate allowed by Georgia law. Accordingly, the preemption provided for in DIDA – which arises by DIDA's express terms only if the federal rate exceeds the interest rate allowed under state law – does not apply in this case. Additionally, Synovus has cited no law or federal regulation that supports the proposition that the purpose of DIDA was to make federal and state-banks equally competitive in all areas; in other words, we find no support for the proposition that DIDA was designed to ensure that all banks have the same revenue sources. We therefore fail to see how allowing these state law claims to proceed at this early stage of the litigation would frustrate the purpose of DIDA.[5]

2. Synovus devotes much of its brief to its argument that the court below erred in finding that the fees at issue could be considered interest under federal law. Although it does not say it in so many words, it appears that Synovus is arguing that the federal definition of interest under DIDA, as evidenced by federal regulations promulgated by the Office of the Comptroller of the Currency, preempts any state

---

[5] In its Amicus Curiae brief, the Georgia Bankers Association argues that Overdraft and Overdraft Collection Fees would not come within the federal definition of interest under the NBA. It further argues that given the similar language between the NBA and DIDA, the two statutes must be construed in pari materia and that, under such a construction, the Overdraft and Overdraft Collection Fees at issue cannot constitute interest under DIDA. We are not persuaded. See *Griner*, supra, 818 F Supp 2d at 1349 (III) (B) (1) (b); *Thomas*, supra, 575 F3d at 799 (II) (A).

13

definition of interest. Assuming this is Synovus's argument, we do not find it persuasive.[6]

The regulation upon which Synovus relies almost exclusively to support its argument is paragraph (a) of 12 CFR § 7.4001. That regulation provides:

(a) Definition. The term "interest" as used in 12 USC [§]85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, creditor-imposed not sufficient funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports.

Regardless of whether one views this "federal" definition of interest as encompassing the overdraft fees at issue, paragraph (c) of 12 CFR § 7.4001 makes clear that this definition does not preempt a state's definition of interest. Specifically,

---

[6] If this is not Synovus's argument, then we fail to see how the federal definition of interest is even arguably controlling, given our holding in Division 1 that the plaintiffs' state law claims are not preempted by federal law.

14

paragraph (c) provides, in relevant part, that "[t]he Federal definition of the term 'interest' in paragraph (a) of this section does not change how interest is defined by the individual states (nor how the state definition of interest is used) solely for purposes of state law." 12 C.F.R. §7.4001 (c). See also *Video Trax, Inc. v. NationsBank, N.A.*, 33 FSupp2d 1041, 1051-1052 (III) (B) (2) (S. D. Fla.,1998), aff'd, 205 F3d 1358 (2000) (quoting 12 C.F.R. § 7.4001(c), and noting that "[t]he Office of the Comptroller of the Currency has declared that the federal definition of 'interest' does not take precedence over the manner in which states define the term.") Accordingly, we find no merit in the argument that the federal definition of interest under DIDA preempts the state definition of interest in this case.

3. Synovus also argues that, even if federal law does not preempt the plaintiffs' claims, the fees at issue do not constitute interest under Georgia law. We find, however, that this question cannot be determined at the pleadings stage.

Georgia's civil usury statute defines interest as "a charge for the use of money computed over the term of the contract at the rate stated in the contract or precomputed at a stated rate on the scheduled principal balance *or computed in any other way or any other form*." (Emphasis supplied.) OCGA § 7-4-2 (a) (1) (A) (3). The criminal usury statute defines interest as including "commission for advances,

15

discount, exchange, or the purchase of salary or wages; by notarial or other fees; *or by any contract, contrivance, or device whatsoever.*" (Emphasis supplied.) OCGA § 7-4-18 (a).

These statutory definitions are very broad and they do not, on their face, exclude the Overdraft and Overdraft Protection fees at issue in this case. Additionally, the only two Georgia appellate decisions involving the definition of interest support the conclusion that the fees at issue could possibly constitute interest under Georgia law.

In *First Fed. Sav. & Loan Assn. of Atlanta v. Norwood Realty Co.*, 212 Ga. 524 (93 SE2d 763) (1956), the Georgia Supreme Court addressed whether a service fee charged in connection with a loan constituted interest. The court concluded that it did, noting that the bank had been unable to identify any service that had been rendered in exchange for the fee, and reasoning:

> the device of charging for services must not be used as a mere cover to exact an additional profit in excess of legal interest; and therefore, the rule has been laid down that to be considered as lawful and [not usurious interest], *such a charge must be shown to be based upon some service rendered*, trouble encountered, inconvenience sustained or risk assumed by the lender, *other than the advance of money. And this [C]ourt has uniformly and consistently held that a lender's charge for service, when*

16

*no service was in fact rendered or to be rendered the borrower, is a charge for the use of the money advanced and is therefore interest.*

(Citations omitted; emphasis supplied.) Id. at Ga. at 531 (2).

Relying on the foregoing decision, this Court has also held that a "service fee" charged in connection with an installment loan constituted interest, because no service was actually provided in exchange for the fee. *Williams v. First Bank & Trust Co.*, 154 Ga. App. 879, 881 (3) (269 SE2d 923) (1980) (quoting the statement in *Norwood Realty* that "a lender's charge for service, when no service was in fact rendered or to be rendered the borrower, is a charge for the use of the money advanced and is therefore interest") (citation and punctuation omitted).

Viewing the definitions of interest found in Georgia's usury laws in conjunction with the holdings in *Norwood Realty* and *Williams*, we conclude that a "fee" imposed by a financial institution will be considered interest where the financial institution: (1) advances money to a customer; (2) charges the fee in exchange for the advance of money; and (3) renders no service to the customer in exchange for that fee, other than the advance of the money. The overdraft fees at issue in this case appear to meet the

17

first two requirements,[7] and there is not enough evidence at this stage of the litigation to determine whether the third requirement has been satisfied. Accordingly, the trial court acted correctly when it denied the motion to dismiss.

Synovus attempts to avoid this result by arguing that both of the above-referenced cases and Georgia's usury statute are "trumped" by a 2003 advisory opinion issued by Georgia's Attorney General. See Ga. Op. Atty. Gen. 2003-9 (August 12, 2003). In that opinion, the Attorney General's Office addressed the question of whether an overdraft fee charged in connection with a check transaction constituted interest. The opinion concluded that it likely did not, because the fee was not based on the time value of money. Specifically, the opinion reasoned:

---

[7] With respect to the first requirement, we note that the Georgia Supreme Court has previously recognized that "every overdraft, whether by previous arrangement or not, and whether secured or not, and whether drawing interest or not, is a loan." (Citation and punctuation omitted.) *Duncan v. State*, 172 Ga. 186, 189 (157 SE 670) (1931) (addressing the constitutionality of a statute imposing criminal liability on bank officers and employees who maintained overdrafts on their accounts, and noting that the question of whether the legislature could punish such conduct was separate from fact that under civil law, an overdraft constitutes a loan). See also *West v. Federal Deposit Ins. Corp.*, 149 Ga. App. 342, 346 (2) (a) (254 SE2d 392) (1979) ("With respect to an overdraft, the general rule seems to be that a bank may recover the amount of an overdraft from a depositor in the same manner in which it could recover an amount loaned to a customer in the regular course of business. A bank paying an overdraft for a depositor may maintain an action therefor against him in indebitatus assumpsit.") (citations and punctuation omitted).

18

a transaction that involves an extension of credit and a charge that is based on a time value of money calculation generally will fall under the usury statute unless a statutory exception exists. A charge that is not truly based on a "time value of money" calculation will not, then, be "interest," *provided* that the lender is actually providing a service for which the charge is assessed *and provided* that the charge bears a reasonable relationship to the cost of providing the service. *These provisos have their origin in decisions of the appellate courts of Georgia.*

(Emphasis supplied.) Opinion at p. 2, citing *Norwood Realty*.

Seizing on the first part of this rationale, Synovus argues that because the fees at issue are not based on the time-value of money, they cannot be considered interest under Georgia law. This argument, however, is flawed for at least two reasons. First, despite Synovus's assertion to the contrary, opinions of the Attorney General do not constitute "controlling authority." "While opinions of the Attorney General are persuasive authority, they are not binding on the appellate courts." (Citation omitted.) *Moore v. Ray*, 269 Ga. 457, 459 (2) (499 SE2d 636) (1998). Second, this argument ignores the provisos set forth in the Attorney General's opinion. And it is those provisos that make this case inappropriate for decision on a motion to dismiss; specifically, there is no evidence to assist a court in determining whether the fees at

19

issue are provided in exchange for a service or, if so, whether the amount of the fee bears a reasonable relationship to the service rendered. As the Attorney General's opinion itself recognized, "[w]hether a particular overdraft protection plan involves the extension of credit and the charging of interest is a fact-intensive review, and each situation must be considered on a case-by-case basis." Ga. Op. Atty. Gen. at p. 2.

4. Synovus argues that if the fees at issue are considered interest under Georgia law, the plaintiffs' claims are barred by the Georgia Credit Card and Credit Card Bank Act, OCGA § 7-5-1 *et seq.*, which, the bank asserts, permits it to charge those fees. We disagree, because the Credit Card Act does not apply with respect to the debit and ATM cards at issue in this case. To fall within the Credit Card Act, a credit card must be issued in conjunction with a "credit card account." See OCGA § 7-5-4 (a) (1). And to qualify as a "credit card account," the lender or credit card bank must "render bills or statements to the debtor at regular intervals, the amount of which bills or statements is payable by and due from the debtor on a specified date as stated in such bill or statement or, at the option of the debtor, but subject to the terms and conditions of the credit card account, may be paid by the debtor in installments." OCGA § 7-5-2 (4) (D). Here, the plaintiffs allege that rather than rendering bills at regular intervals payable "on a specified date as stated in such bill or statement," or permitting

20

overdrafts to be paid in "installments," Synovus sends out a notice informing the account holder of the overdraft and requiring that any associated fees be paid "immediately." In light of this fact, the debit and ATM cards at issue do not fall within the ambit of the Georgia Credit Card Act.

Based on the foregoing, we find that the trial court correctly concluded that Synovus cannot show that the complaint fails to state a claim upon which relief can be granted. Accordingly, we affirm the trial court's order denying Synovus's motion to dismiss.

*Judgment affirmed. Andrews, P. J., and Doyle, P. J., concur.*